BURKE, Judge.
Steven Petrie was convicted of murder made capital because it was committed during a rape in the first degree, see § 13A-5-40(a)(3), Ala.Code 1975. The jury, by a vote of 10 to 2, recommended that Petrie be sentenced to death. The trial court followed the jury’s recommendation. Petrie appeals his conviction and his sentence.

Facts

The State’s evidence tended to show the following. On March 9, 1990, the victim, Toni Lim, was found dead on her bed in the apartment she shared with Martha Milinda Higginbotham. The apartment was located in Homewood, a suburb of Birmingham. Higginbotham discovered Lim’s body after returning home from work at around 8:00 p.m. Lim was alone in the apartment when Higginbotham left for work earlier that day. There were no signs of forced entry into the apartment. Higginbotham testified that Lim had previously told her that a man named “Steven” was going to help Lim fix the brakes on her car. Higginbotham also testified that a man named Steven sometimes gave Lim a ride home from school. However, Higginbotham had never met Steven. Barbara Short testified that in March 1990, she lived with Petrie, whom she had married in January 1990 after a brief courtship, in the Birmingham area.
Lim’s mother testified that she had recovered Lim’s watches and gold chain from Lim’s apartment after her death. However, Lim’s mother also testified that she knew that Lim possessed wedding rings and that they were missing from the apartment and were never recovered. A former property evidence technician for the Homewood Police Department who collected evidence from Lim’s apartment after her death testified that he specifically looked for Lim’s rings after her death but that he never found them.
When Lim was found lying on her bed in her apartment, her body was covered with a blanket, and her head was covered with a pillow. Examination of Lim’s body revealed that she had suffered a stab wound to the back of her neck and a large cut across her throat. Lim was dressed in only a blouse and a brassiere. The brassiere was unlatched in the front, and only one button was buttoned on the blouse. The other buttons on the blouse were intact but unbuttoned. A T-shirt tied loosely around Lim’s neck was soaked with blood. Lim’s hands were tied behind her back with pantyhose. An exercise rope was tied tightly around Lim’s right wrist, and the rope extended down to her ankles, which were tied together with the rope. The rope was tied in such a way that it would tighten if Lim’s legs were straightened. The rope caused abrasions and bruising on certain areas of Lim’s skin. All of Lim’s fingernails were intact. The autopsy of Lim’s body did not reveal any appreciable evidence of trauma to her genitalia. However, the presence of semen was discovered in Lim’s vagina and anus. Also, some round bruises were discovered on Lim’s right leg. Dr. Gary Simmons, the forensic pathologist who performed the autopsy on Lim, testified that the round bruises could have been caused by fingers grabbing Lim’s leg, but he could not be certain what caused these bruises. Dr. Simmons testified that Lim “died from the sharp force entry, mainly the stab wound to the back of her neck and the incised wound to her throat.” (R. 1123.)
In 1990 and again in 1998, ABO blood testing and rudimentary DNA testing were performed on items recovered in and around Lim’s body. The results of that testing excluded several individuals as suspects, but the results did not match the *188 DNA of any person of interest. In 2004, additional DNA testing using more modern techniques revealed that the DNA profile from the semen found in Lim’s body matched the DNA profile found on some of the cigarette butts that were in Lim’s bedroom on the day she was killed.
Debra Kay Dodd, who performs DNA analyses for the Alabama Department of Forensic Sciences, testified that, in June 2006, she received information from the administrator of the national Combined DNA Index System (“CODIS”)[1] that the DNA profile of the semen found in Lim’s body matched the DNA profile of Petrie, who at the time was in prison in Illinois. After receiving oral reference samples from Petrie in August 2006, Dodd tested the samples and generated a DNA profile for Petrie. Dodd found that Petrie’s DNA profile matched the DNA profile of the semen found in Lim’s body and the DNA profile found on some of the cigarette butts that were found in Lim’s bedroom.
After Dodd had finished testifying, at the request of defense counsel, the defense and the prosecution agreed to admit into evidence a laboratory report prepared by a DNA expert for the defense. (R. 1279-82, 1296-97.) The report was marked as both a State’s exhibit and a defendant’s exhibit. (C. 532.) The results of that report did not contradict the results of Dodd’s testing. Both Dodd and the expert for the defense concluded that the DNA profile of the semen donor on the vaginal swab of Lim’s body matched Petrie’s DNA profile. (R. 1243-44, 1250-51; C. 537-38.) The defense expert also concluded that Petrie’s DNA was present in stains on a blanket recovered from the crime scene. (C. 537.) Additionally, the laboratory report prepared by the expert for the defense stated that “[t]he DNA profile obtained from the swab taken from the right hand fingernail clippings is a mixture” and that “Steven Petrie is included in this mixture.” (C. 538.)
At trial, the State presented evidence of other bad acts of Petrie. Gerald Gear, who was a detective for the Joliet, Illinois, police department in 1994, gave testimony concerning Debra O’Rourke, a white female who was found murdered in her apartment in Illinois at around 10:00 a.m. on July 6,1994. The last time that anyone had communicated with O’Rourke was on July 3,1994. Gear testified that O’Rourke was found lying on her stomach across the bed in her bedroom. The bedroom had been ransacked. O’Rourke was covered with a blanket and there was a pillow on top of her head. Also, a washcloth was lying on O’Rourke’s shoulder. O’Rourke’s blood had coagulated on another pillow near her head. A T-shirt was tied around O’Rourke’s head. O’Rourke’s arms were behind her back, and she had markings on her wrists and ankles that indicated that she had been bound with ligatures. There were no signs of forced entry into O’Rourke’s apartment. Gear testified that his investigation revealed that O’Rourke was dating two men at the time of her death. One of those men was Petrie, who was the maintenance man at O’Rourke’s apartment complex. According to Gear, telephone records revealed that a call was made from O’Rourke’s residence to Pe-trie’s residence at around 5:10 p.m. on July 4, 1994. Another telephone call was made from O’Rourke’s residence to the residence of Petrie’s ex-girlfriend at 12:06 a.m. on July 5, 1994. Both the State and the defense stipulated that Petrie used or attempted to use O’Rourke’s ATM card on *189 several occasions on July 5, 1994. A wedding ring and a set of keys were missing from O’Rourke’s apartment. The keys were never recovered, but the ring was eventually found in Petrie’s possession.
Dr. Joseph Sapala performed the autopsy on O’Rourke’s body. At the trial in the present case, Dr. Sapala testified that O’Rourke was found nude on her bed and that her head was covered with blood. Dr. Sapala further testified that O’Rourke had a gag in her mouth and a shirt tied tightly around her neck and head. Dr. Sapala also noted that O’Rourke had bruising around her wrists that could have been caused by being bound with ligatures or handcuffs. According to Dr. Sapala, O’Rourke died from strangulation and stab wounds to her neck.
DNA testing was performed on certain items that were recovered from O’Rourke’s apartment. Those items included the washcloth that was found lying on O’Rourke’s shoulder, O’Rourke’s bed sheet, and a pillowcase. A stain on the washcloth contained a mixture of blood and semen, and the DNA profile identified on that stain matched Petrie’s DNA profile. The pillowcase contained a semen stain, and the DNA profile of that stain also matched Petrie’s DNA profile. The bedsheet contained two semen stains. The DNA profile identified on those two stains matched the DNA profile of the other man O’Rourke was dating at the time of her death.
In light of the evidence concerning O’Rourke’s death and the use of her ATM card, Petrie was tried for murder and robbery in Illinois. Petrie was convicted of the robbery, but he was acquitted of murder. Petrie was not charged with rape in the situation involving O’Rourke.
Doug Finch, a detective with the Home-wood Police Department who reopened the present case in 2004, requested the additional DNA testing on the items that were recovered in and around Lim’s body, and he asked that the results of that testing be entered into the CODIS. When the CO-DIS revealed that the DNA profile of the semen found in Lim’s body matched the DNA profile of Petrie, Detective Finch traveled to Illinois to collect DNA samples from Petrie and to further investigate Pe-trie. During that investigation, Detective Finch viewed photographs of the O’Rourke crime scene. At trial, Detective Finch was asked to describe the similarities between the O’Rourke crime scene and the Lim crime scene. Detective Finch testified that the personal items in the victims’ bedrooms had been ransacked; that the victims’ bodies were nude; that ligatures or some type of restraints had been used to restrain the victims; that the victims’ heads were covered with a pillow; that there were stab wounds to the back of the victims’ necks; that there were incisions or cut marks on the victims’ necks; that Pe-trie’s semen was present at the scene of both crimes; that the victims’ keys and wedding rings were missing; that O’Rourke and Lim were similar in appearance; that there were no signs of forced entry into the victims’ apartments; and that the victims lived in second-floor apartments.
The State also presented evidence of an incident that occurred in Illinois involving Petrie and Tina Hillock. At trial, Hillock testified that she dated Petrie from October 1993 to June 1994. In June 1994, Hillock told Petrie that she did not want to see him anymore. On August 13, 1994, Hillock left her second-floor apartment for the afternoon, and she locked the door to the apartment when she left. Hillock returned to her apartment later that evening. As soon as Hillock entered her apartment, she- sensed that something was wrong and grabbed a knife from the kitch *190 en to protect herself. Petrie was inside the apartment, and he immediately confronted Hillock and began screaming at her. Petrie took the knife away from Hillock and threw it into the kitchen sink. A short time later, Hillock attempted to leave the apartment through the front door, but as soon as she opened the door, Petrie grabbed her and threw her onto the couch. Petrie told Hillock that “if he can’t have [her] nobody else would.” (R. 1494.) Petrie then put his hands around Hillock’s throat. Then, in an attempt to prevent Petrie from hurting her, Hillock falsely told Petrie that she was pregnant. At that time, according to Hillock, “[Petrie] got up off of [her] and he punched the wall and put a hole through the wall.” (R. 1495.) Hillock then made a second attempt to leave the apartment, but again Petrie grabbed her and threw her onto the couch. A short time later, in response to a call that had been made by a third party, police officers arrived at Hillock’s apartment. After the officers talked to Hillock, they arrested Petrie. Hillock then went with the officers to the police station.
Petrie’s vehicle was discovered parked about two blocks from Hillock’s apartment. A bag containing some of Hillock’s undergarments and jewelry was discovered inside Petrie’s vehicle. Hillock testified that she had not given Petrie permission to enter her apartment or to take her personal property.
After filing charges against Petrie and obtaining a protection order, Hillock returned to her apartment. When Hillock returned, she discovered a roll of duct tape and the belt to her bathrobe lying in her son’s bedroom. Hillock testified that neither she nor her children had placed those items in that location.
During cross-examination, Hillock admitted that during a preliminary hearing in an Illinois court in 1994, she gave a completely different account of what had occurred on August 13, 1994. During that hearing, Hillock testified that the violent incident in her apartment involving Petrie never happened. Hillock also asked that the charges against Petrie in Illinois to be dropped. In the present case, Hillock testified that she lied to the Illinois court because she was “terrified” of Petrie and was afraid that he would harm her. (R. 1512.)
One of the officers that arrested Petrie for assaulting Hillock testified that as he was booking Petrie, the officer removed three rings from the pocket of Petrie’s pants. Hillock identified two of the rings as belonging to her. At trial, the third ring was identified as the ring that was missing from O’Rourke’s apartment.
The defense did not present any testimony to the jury during the guilt phase of the trial.

Discussion

In his brief to this Court, Petrie raises several issues that were not first raised in the trial court; thus, those issues were not preserved for appellate review. Nevertheless, because Petrie was sentenced to death, his failure to raise issues in the trial court does not prevent this Court from reviewing those issues for plain error.
Rule 45A, Ala. R.App. P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
In Wilson v. State, 142 So.3d 732, 750 (Ala.Crim.App.2012), this Court stated:
*191 “‘[T]he plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” ’ United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)). ‘The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.’ Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999). Under the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error aversely affected the outcome of the trial. See Ex parte Walker, 972 So.2d 737, 752 (Ala.2007) (recognizing that the appellant has the burden to establish prejudice relating to an issue being reviewed for plain error); Thomas v. State, 824 So.2d 1, 13 (Ala.Crim.App.1999) (recognizing that to rise to the level of plain error, an error must have affected the outcome of the trial), overruled on other grounds, Ex parte Carter, 889 So.2d 528 (Ala.2004). That is, the appellant must establish that an alleged error, ‘ “ ‘not only seriously affeet[ed] [the appellant’s] “substantial rights,” but ... also ha[d] an unfair prejudicial impact on the jury’s deliberations.’ ” ’ Ex parte Brown, 11 So.3d 933, 938 (Ala.2008) (quoting Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002), quoting in turn Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)). Only when an error is ‘so egregious ... that [it] seriously affects the fairness, integrity or public reputation of judicial proceedings,’ will reversal be appropriate under the plain-error doctrine. Ex parte Price, 725 So.2d 1063, 1071-72 (Ala.1998) (internal citations and quotations omitted). Although the ‘failure to object does not preclude [appellate] review in a capital case, it does weigh against any claim of prejudice.’ Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala.1985) (citing Bush v. State, 431 So.2d 563, 565 (1983)) (emphasis in original). As the United States Supreme Court has noted, the appellant’s burden to establish that he is entitled to reversal based on an unpre-served error ‘is difficult, “as it should be.” ’ Puckett v. United States, 556 U.S. 129,135,129 S.Ct. 1423,173 L.Ed.2d 266 (2009) (quoting United States v. Dominguez Benitez, 542 U.S. 74, 83, n. 9, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004)).”

Guilt-Phase Issues

I.
On appeal, Petrie first argues that the trial court erred by allowing evidence of the August 13,1994, incident involving Hillock. Petrie alleges that the admission of that evidence violated Rule 404(b), Ala. R. Evid. The State responds that the trial court did not exceed its discretion by allowing the evidence concerning Hillock because, the State says, that evidence was relevant to show Petrie’s identity and to show that he acted pursuant to a common plan, scheme, or design.
In Irvin v. State, 940 So.2d 331 (Ala.Crim.App.2005), this Court stated:
“ ‘The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.’ Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). This is equally true with regard to the admission of collateral-acts evidence. See Davis v. State, 740 So.2d 1115, 1130 (Ala.Crim.App.1998). Moreover, ‘ “[a] trial court will not be placed in error for *192 assigning the -wrong reason for a proper ruling, if that ruling is correct for any reason.” ’ Peraita v. State, 897 So.2d 1161, 1183 (Ala.Crim.App.2003), aff'd, 897 So.2d 1227 (Ala.2004) (quoting Nicks v. State, 521 So.2d 1018, 1030-31 (Ala.Crim.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988)).”
940 So.2d at 345.
Rule 404(b), Ala. R. Evid., provides:
“Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.”
“[T]he common plan, scheme, or design exception is ‘essentially coextensive with the identity exception,’ and ‘applies only when identity is actually at issue.’ ” Lewis v. State, 889 So.2d 623, 661 (Ala.Crim.App.2003) (quoting Ex parte Darby, 516 So.2d 786, 789 (Ala.1987), and Campbell v. State, 718 So.2d 123, 128-29 (Ala.Crim.App.1997)). Concerning the identity exception to the general exclusionary rule, this Court has stated:
“Collateral-act evidence is admissible to prove identity only when the identity of the person who committed the charged offense is in issue and the charged offense is committed in a novel or peculiar manner. 1 Charles W. Gamble, McElroy’s Alabama Evidence § 69.01(8) (5th ed.1996); Ex parte Arthur, 472 So.2d 665 (Ala.1985); Johnson v. State, 820 So.2d 842, 861 (Ala.Crim.App.2000); Tyson v. State, 784 So.2d 328, 344 (Ala.Crim.App.), aff'd, 784 So.2d 357 (Ala.2000). ‘Under the identity exception to the general exclusionary rule prohibiting the admission of other or collateral crimes as substantive evidence of the guilt of the accused, the prior crime is not relevant to prove identity unless both that and the now-charged crime are “signature crimes” having the accused’s mark and the peculiarly distinctive .modus operandi so that they may be said to be the work of the same person.’ Bighames v. State, 440 So.2d 1231, 1233 (Ala.Crim.App.1983). ‘[E]vi-dence of a prior crime is admissible only when the circumstances surrounding the prior crime and those surrounding the presently charged crime “exhibit such a great degree of similarity that anyone viewing the two offenses would naturally assume them to have been committed by the same person.”’ Ex parte Arthur, 472 So.2d at 668 (quoting Brewer v. State, 440 So.2d 1155, 1161 (Ala.Crim.App.1983)). See also Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); and Govan v. State, 40 Ala.App. 482, 115 So.2d 667 (1959) (recognizing that the identity exception is applicable only where both the prior crime and the charged offense were committed in the same special or peculiar manner).
“When extrinsic offense evidence is introduced to prove identity, the likeness of the offenses is the crucial consideration.”
Irvin, 940 So.2d at 347.
In the present case, the defense’s theory was that Petrie had consensual sex with Lim but that he was not the person who killed her. Thus, the identity of Lim’s killer was at issue. Considering there was no eyewitness to Lim’s murder, it was *193 necessary for the State to present other evidence proving the identity of the killer. That evidence included Petrie’s collateral bad acts involving Hillock and O’Rourke.[2] Like Hillock and O’Rourke, Lim was a woman who lived in a second-floor apartment. Like the situations involving Hillock and O’Rourke, the person who committed the crime against Lim entered her apartment without any signs of a forced entry. Like Hillock and O’Rourke, there was evidence indicating that Lim had a prior relationship with Petrie. In all three situations, the women’s rings were taken while other personal property was left behind. Further, the State presented evidence indicating that Lim and O’Rourke had been bound with ligatures and that each murdered woman was discovered in a bedroom of her apartment. There was evidence indicating that before Petrie assaulted Hillock, he placed a roll of duct tape and the belt from her robe in one of her bedrooms. A fair inference is that those items were to be used to bind Hillock in the bedroom. When comparing the likeness of the offenses against Hillock and Lim, the fact that Petrie’s acts against Hillock were stopped before he had an opportunity to bind her in the bedroom does not prevent the trial court from considering evidence indicating that Petrie intended to bind Hillock in the bedroom. We conclude that, considering all the similarities between the crime against Lim and the acts against Hillock, the trial court did not exceed its discretion in determining that the evidence of Petrie’s collateral bad acts indicated a distinctive pattern of behavior by him. Because the evidence indicated a particular method of operating, the trial court did not exceed its discretion in finding that the evidence of Petrie’s bad acts against Hillock was admissible under Rule 404(b) as proof of the identity of Lim’s killer.
Also, although Petrie does not specifically argue that the probative value of Hillock’s testimony was substantially outweighed by undue prejudice to Petrie resulting from the testimony, we recognize that “not only must it be determined that the other offenses are material and relevant to an issue other than the character of the accused and fall within an exception to the exclusionary rule, but the probative value must not be substantially outweighed by undue prejudice.” Averette v. State, 469 So.2d 1371, 1373-74 (Ala.Crim.App.1985). See also Rule 403, Ala. R. Evid. (providing that “[although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence”).
This Court has stated:
“ ‘Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government’s case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects.’ United States v. *194 Turquitt, 557 F.2d 464, 468-69 (5th Cir.1977) (citations omitted).
“However, it is ‘only when the probative value of evidence is “substantially outweighed by the danger of unfair prejudice,” ... that relevant evidence should be excluded.’ United States v. Bailleaux, 685 F.2d 1105, 1111 (9th Cir.1982) (emphasis in original). ‘[T]he probative value of the evidence of other offenses must also be balanced against its “prejudicial nature” to determine its admissibility. “Prejudicial” is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.’ State v. Daigle, 440 So.2d 230, 235 (La.Ct.App.1983).
‘“Of course, “prejudice, in this context, means more than simply damage to the opponent’s cause. A party’s case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.” State v. Hurd, Me., 360 A.2d 525, 527 n. 5 (1976), quoting McCormick, Handbook on the Law of Evidence § 185 at 439 n. 31 (2nd ed.1972).’
“State v. Forbes, 445 A.2d 8, 12 (Me.1982).”
Averette, 469 So.2d at 1374. As with most questions concerning the admissibility of evidence, “[t]he power to make this determination [whether the probative value of relevant evidence is substantially outweighed by danger of unfair prejudice] is vested in the trial court,” and “we will not disturb such determination unless it is clearly abuse of discretion.” Hayes v. State, 717 So.2d 30, 37 (Ala.Crim.App.1997).
As explained earlier, Hillock’s testimony was relevant to prove the identity of Lim’s killer. Because the identity of Lim’s killer was very much at issue, Hillock’s testimony was reasonably necessary to the State’s case. Of course, Hillock’s testimony was prejudicial to Petrie’s case because her testimony was contrary to Petrie’s theory of the case, but the fact that Hillock’s testimony was prejudicial to Petrie’s case does not mean that Hillock’s testimony was unduly or’unfairly prejudicial. Hillock’s testimony was admissible to show that in killing Lim, Petrie acted pursuant to a common plan, scheme, or design. Other than Hillock’s testimony and the evidence concerning O’Rourke, the record does not contain any suggestion that there was a less prejudicial means of proving the identity of Lim’s killer. See R.D.H. v. State, 775 So.2d 248, 254 (Ala.Crim.App.1997) (stating that “[o]ne of the specific criterion to be used, in deciding when prejudicial effect substantially outweighs probative value, is whether or not there exist less prejudicial means of proving the same thing”). Therefore, we find that the trial court did not clearly abuse its discretion in determining that the probative value of Hillock’s testimony was not substantially outweighed by the danger of unfair prejudice.
II.
Next, Petrie argues that, in addition to allowing Hillock to testify concerning the August 13, 1994, incident, the trial court erroneously allowed Hillock to testify about Petrie’s character and about other collateral bad acts. Petrie alleges that the admission of this testimony violated Rule 404, Ala. R. Evid. Specifically, Petrie contends that, in violation of Rule 404(a), the trial court erroneously allowed Hillock to testify that “he was very, very aggressive” and that he had stalked her. Petrie also *195 contends that, on redirect examination, the trial court erroneously allowed Hillock to testify about a collateral bad act that occurred “just prior to” the August 18, 1994, assault. That incident involved Petrie’s taking the keys to Hillock’s apartment and making a copy of them without her permission. Petrie alleges that the State did not provide him with proper notice of that collateral-bad-act evidence, as required by Rule 404(b), Ala. R. Evid.
A.
Concerning Hillock’s statements that Petrie “was very, very aggressive” and that he had stalked her, Petrie alleges that the admission of those statements violated Rule 404(a), Ala. R. Evid., which provides that “[ejvidence of a person’s character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion.” Specifically, Petrie states that “[t]here is a substantial danger that the jury impermis-sibly inferred from this improperly admitted evidence that Petrie killed Lim because he was of a character to do so.” (Petrie’s brief, at 42.)
Petrie’s allegation is based upon the following exchange that occurred during Hillock’s testimony at trial:
“[Hillock]: [Petrie and I] started dating, I think it was, in October; and then in June of the following year I told him I didn’t want to see him anymore.
“[Prosecutor]: And what were the reasons why you didn’t want to see him anymore?
“[Hillock]: There were some things that came up in the relationship that made me very uncomfortable. He was very, very aggressive—
“[Defense counsel]: Objection, Your Honor. Nonresponsive.
“The Court: Well, I want to make sure that we’re limited to the incident in question. All right. So let’s limit our questioning to that.
“[Prosecutor]: Yes, sir. I’m just trying to establish that she did break up with him.
“[Defense counsel]: That’s pretty obvious, Your Honor.
“The Court: I think she testified to that. All right.”
(R. 1484-85) (emphasis added).
Later during Hillock’s testimony, the following exchange occurred concerning her attempt to call her brother for help during the August 13,1994, incident:
“[Prosecutor]: And so what did you do next?
“[Hillock]: I called my brother’s house. And I said — I thanked him for inviting me over for the barbecue.
“[Prosecutor]: Now, had you been at your brother’s house at the barbecue?
“[Hillock]: No. No.
“[Prosecutor]: Why did you say these things to your brother?
“[Hillock]: Because my family knew that Steve had been stalking me.
“[Defense counsel]: Objection, Your Honor. Nonresponsive.
“[Defense cocounsel]: Objection. Nonresponsive and hearsay.
“The Court: I’m going to sustain. Let’s not go into that.
“[Hillock]: Okay.
“The Court: Continue with what happened.
“[Defense cocounsel]: Move to strike.
“[Defense counsel]: Move to strike, Judge.
“The Court: Granted. Let’s disregard that.”
(R. 1492-93) (emphasis added).
There was no other testimony concerning the alleged stalking or Petrie’s alleged *196 prior aggression. Later, Hillock testified that she had obtained a protective order against Petrie, and, in Petrie’s brief on appeal, he insinuates that the testimony concerning the protective order was related to the testimony concerning the alleged stalking and his alleged prior aggression. However, it is clear from the context of the testimony concerning the protective order that the protective order was issued based on the August 13, 1994, incident at Hillock’s apartment and that the protective order was not related to the alleged stalking or Petrie’s alleged prior aggression. The testimony concerning the protective order did not repeat or highlight the testimony concerning the alleged stalking or Petrie’s alleged prior aggression. (R. 1498-99.)
We note that the specific bases of Pe-trie’s objections were that Hillock was being “nonresponsive” to the prosecutor’s questions or that her response was hearsay. The objections were not based on Rule 404, Ala. R. Evid.
“[I]n order for this Court to review an alleged erroneous admission of evidence, a timely objection must be made to the introduction of the evidence, specific grounds for the objection should be stated, and a ruling on the objection must be made by the trial court.” Shouldis v. State, 953 So.2d 1275, 1284 (Ala.Crim.App.2006). Additionally, “[t]he statement of specific grounds of objection waives all grounds not specified.” Wilson v. State, 142 So.3d 732, 761 (Ala.Crim.App.2012). Because Petrie did not make an objection to Hillock’s statements based on Rule 404, he did not preserve this issue for appellate review; thus, this issue will be reviewed for plain error only. See Rule 45A, Ala. R.App. P.; Wilson, supra.
On appeal, Petrie has not met his difficult burden of establishing that “an obvious, indisputable error occurred” and that “the error aversely affected the outcome of the trial.” Wilson, 142 So.3d at 750. Petrie has failed to meet his burden of establishing plain error for two alternative reasons: (1) He has failed to overcome the presumption against error when the trial court sustains the objection to the testimony and/or instructs the jury to disregard the testimony, and (2) even if the testimony was not removed from the jury’s consideration by the trial court’s actions, Pe-trie has failed to show that the admission of the statements rose to the level of plain error.
This Court has stated:
“ ‘There is a prima facie presumption against error when the trial court immediately charges the jury to disregard improper remarks or answers.’ Garrett v. State, 580 So.2d 58, 59 (Ala.Crim.App.1991).
“ ‘ “The general rule is that prejudicial statements, even though improper, are considered capable of being eradicated by the trial court in sustaining objections thereto or by appropriate instructions to the jury or both. Meredith v. State, 370 So.2d 1075 (Ala.CrimApp.), cert. denied, 370 So.2d 1079 (Ala.1979).” Bui v. State, 551 So.2d 1094 (Ala.Crim.App.1988),
[[Image here]]
“Holladay v. State, 549 So.2d 122, 131 (Ala.Crim.App.1988), aff'd, 549 So.2d 135 (Ala.1989).”
Walker v. State, 932 So.2d 140, 153 (Ala.Crim.App.2004).
Furthermore, “[w]here the trial court immediately instructs the jury not to consider a fact, that instruction, in effect, removes or excludes that matter from the jury’s consideration, and the prejudicial effect of the statement is deemed to be cured by such instruction.” Soriano v. *197 State, 527 So.2d 1367, 1371 (Ala.Crim.App.1988).
Concerning Hillock’s statements that Petrie “was very, very aggressive” and that he had stalked her, though Pe-trie’s objections to those statements were not based on Rule 404, the trial court nevertheless sustained Petrie’s objections to those statements. In response to Pe-trie’s objection to Hillock’s statement that Petrie “was very, very aggressive,” the trial court instructed the prosecutor to limit his questioning to the August 13, 1994, incident. In response to Petrie’s objection to Hillock’s statement that Petrie had stalked her, the trial court explicitly stated that it was “going to sustain” the objection and instructed the prosecutor to “not go into that.” Then, after defense counsel moved to strike that statement, the trial court immediately gave an instruction to disregard the statement. Therefore, we will presume that any prejudice that resulted from either statement was eradicated when the trial court sustained the objections to the statements. Furthermore, the statement concerning the alleged stalking was explicitly removed from the jury’s consideration, and any prejudicial effect of that statement was cured when the trial court immediately instructed the jury to disregard the statement. Thus, based on the trial court’s responses to Petrie’s objections, there is a prima facie presumption that no error occurred, much less plain error. We find that Petrie has failed to set forth anything on appeal that would overcome that presumption or to set forth anything that would meet his difficult burden of establishing that an obvious, indisputable error occurred and that the error aversely affected the outcome of the trial.
Moreover, even if Hillock’s statements had been improperly admitted into evidence, the admission of the statements did not rise to the level of plain error because the statements did not seriously affect Pe-trie’s substantial rights or the fairness and integrity of the proceedings, nor did they have an unfair prejudicial impact on the jury’s deliberations.
In Clark v. State, 896 So.2d 584 (Ala.Crim.App.2000), the defendant was convicted of murder and was sentenced to death. At trial, an investigator testified regarding a ticket citation he found when he inventoried the defendant’s wallet after he was arrested. Without any objection from the defendant, the investigator testified that the ticket was for a prior domestic disturbance. On appeal, this Court stated that this evidence “falls squarely within the exclusionary rule prohibiting evidence of an accused’s bad character” and “it does not come within any of the exceptions set out in Rule 404(b).” Clark, 896 So.2d at 622. Thus, “it was error to allow this evidence to be presented to the jury.” Id. However, this Court further held that the error in admitting the testimony regarding the domestic-disturbance citation did not rise to the level of plain error. In reaching that decision, this Court noted that the domestic disturbance was not mentioned again at trial and that the reference to the ticket was incidental because “it came in the form of a nonresponsive answer by [the investigator] to the question by the prosecutor regarding whether there were any bills in [the defendant’s] wallet.” Clark, 896 So.2d at 624. This Court stated that “‘[i]t is inconceivable that a jury could have been influenced, under the circumstances here, to convict [the defendant] of [a] crime[ ] of the magnitude charged here because of an oblique reference to a prior [domestic dispute].’ ” Id. (quoting Thomas v. State, 824 So.2d 1, 20 (Ala.Crim.App.1999)).
Likewise, in the present case, Hillock’s references to Petrie’s prior aggression and to the alleged stalking, made only in pass *198 ing and in the form of nonresponsive answers to the prosecutor’s questions, were incidental. Furthermore, neither Petrie’s alleged prior aggression during his relationship with Hillock nor the alleged stalking were mentioned again at trial. Therefore, we hold that these oblique references did not seriously affect Petrie’s substantial rights or the fairness and integrity of the proceedings, nor did they have an unfair prejudicial impact on the jury’s deliberations; thus, we find no plain error in the admission of the statements.
B.
Next, Petrie contends that, on redirect examination, the trial court erroneously allowed Hillock to testify about a collateral bad act that had occurred “just prior to” the August 13, 1994, assault. That incident involved Petrie’s taking the keys to Hillock’s apartment and making a copy of them without her permission. Pe-trie alleges that the State did not provide him with proper notice of that collateral-bad-act evidence under Rule 404(b), Ala. R. Evid., which states that “upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any [collateral-bad-act] evidence it intends to introduce at trial.”
Before trial, Petrie’s counsel requested that the State provide notice of the general nature of any Rule 404(b) evidence it intended to introduce at trial. In response, the State informed the defense that the State intended to introduce, among other things, evidence that “approximately four years after the murder of Toni Lim, the Defendant stalked, threatened and made preparations for the restraint and murder of a former girlfriend.” (C. 190.) In the State’s brief in support of its notice to introduce Rule 404(b) evidence, the State informed the defense that the State was seeking to introduce, among other things, evidence that “shortly after the murder of Debra O’Rourke, the defendant stalked, threatened, and made preparations for the restraint and murder of Tina Hillock in Will County, Illinois. The State would further show the theft by defendant of Ms. Hillock’s lingerie, keys, and wedding ring.” (C. 195.)
During the State’s direct examination of Hillock at trial, she testified that she locked her apartment when she left it on August 13, 1994, but when she returned to her apartment later that day, Petrie was inside the apartment without her permission. However, during the defense’s cross-examination of Hillock, she conceded that during a 1994 preliminary hearing in Illinois, she testified that she had invited Petrie to come to her apartment on August 13, 1994, and that she had permitted him to come inside. At trial, Hillock also stated that her 1994 testimony was false. After defense counsel had completed cross-examination, outside the presence of the jury, the State moved the trial court to allow Hillock to testify concerning the incident in which Petrie made a copy of the keys to Hillock’s apartment without her permission.. The State desired to present this.evidence to rebut the testimony elicited on cross-examination and to show that Petrie had the means to enter Hillock’s apartment without her permission and without forcing his way into the apartment. Defense counsel objected to the presentation of this evidence on the ground that the prosecution had not provided the defense with reasonable notice of the evidence under Rule 404(b). Specifically, defense counsel stated:
“Well, first, as to this incident they are referring to, obviously I don’t know that we know about that. But if that is in the nature and companion with Ms. *199 Hillock, and Ms. Hillock is being called [Rule] 404(b) evidence, then we are supposed to — and have written a motion asking for [Rule] 404(b) evidence. We are supposed to be given some type of timely notice about that incident.
[[Image here]]
“Well, once again, I’m not sure about what incident that is and what you’re referring to or any factual basis for that incident. We, once again, would look upon that as [Rule] 404(b) evidence that we previously have not received or been notified of. And so certainly we haven’t had an opportunity to look or investigate or even know really what they are talking about with fact or basis. And so, once again, we’d ask that it be excluded.”
(R. 1555-57.)
The prosecutor then pointed out that the defense was provided with a copy of the transcript of Hillock’s 1994 testimony and that, in that testimony, Hillock talks about the incident in which Petrie made a copy of the keys to her apartment without her permission. The prosecutor stated:
“Okay. Your Honor, the transcript that we gave to the defense counsel, Ms. Hillock’s transcript. And it’s kind of broken up throughout the conversation.
“But she first — in page 4 of the transcript, she talks about — I’m sorry. Page 8, Ms. Hillock states that: ‘In June of that year, I moved to Orland Park. He came with and helped me to move. And as I was unpacking my boxes and stuff, he says to me, your car is really dirty. I’m going to take your car and get it washed. So he took my car to get it washed. I didn’t realize actually what he was doing.’
“Okay. And then it’s kind of — it kind of breaks up. And then she goes back to say — they talk about some other matters. But on page 5, she says: T went over to my ex-husband’s. I had found out from [Petrie] that he had made copies of my keys,’ referring back to the time that he took her car to go get it washed. She says, ‘That’s how he got into my apartment, so immediately I called the locksmith.’ ”
(R. 1558-59.)
After those statements by the prosecutor, Petrie’s counsel did not make any further argument concerning this issue. The trial court then ruled that Hillock would be allowed to testify concerning the incident in which Petrie made a copy of the keys to her apartment without her permission.
After the jury was seated but before Hillock gave any testimony on redirect examination, defense counsel stated that “at this time we would renew our previous motion and assign those grounds and objections.” The trial court responded: “I’ll note that motion and overrule the motion and allow the State to proceed.” (R. 1568.) On redirect examination, Hillock testified, in part, as follows:
“[Prosecutor]: .... Did [Petrie] ever specifically take some keys from you?
“[Hillock]: Yes, he did.
[[Image here]]
“[Prosecutor]: Can you tell us about that?
[[Image here]]
“[Hillock]: So he said that my car looked dirty and that he would take it to get it washed, which I thought was incredibly nice.
“[Prosecutor]: Now, did he do that?
“[Hillock]: Yes, he did.
“[Prosecutor]: Take your car?
“[Hillock]: He took my car to get it washed.
“[Prosecutor]: And he took your keys?
“[Hillock]: Yes.
*200 “[Prosecutor]: Then what happened?
“[Hillock]: He came back, and I didn’t think anything of it.
“[Prosecutor]: Was there a point later in time that you learned what he had done with your keys when he took your car to be washed?
“[Hillock]: Yes.
“[Prosecutor]: And how did you learn that?
“[Hillock]: I had come home, and I walked into the house and I just noticed things were missing. The key to my grandfather clock was missing, my camera, my telephone book, a bunch of my little pigs — I collect pigs. And then when I looked in my undergarment drawer, my underthings — some of my underthings — were missing and then my mom and dad’s wedding rings.
“[Prosecutor]: Now, at some point did you confront the defendant about this?
“[Hillock]: Yes. I contacted Steve and I said, “Were you in my apartment?’ And he said, ‘No, I wasn’t.’ And I said, ‘All I want back are my parents’ rings. If I don’t get back my mom and dad’s wedding rings, my brothers are going to be very upset and they will make sure they get those back.’ So he said—
[[Image here]]
“[Prosecutor]: Let me ask you this. Did he say anything about what he did with your keys when he took your car to be washed?
“[Hillock]: Yes. When he—
“[Prosecutor]: What did he say?
“[Hillock]: He said that he had made, a copy of my keys without my permission.
“[Prosecutor]: And did he say anything about using those to get into your apartment without your permission?
“[Hillock]: Yes. He had used the keys in order to get into the apartment and take those items.”
(R. 1571-74.)
On appeal, to support his argument that the State did not provide him with proper notice under Rule 404(b), Petric relies on Ex parte Lawrence, 776 So.2d 50 (Ala.2000). In Lawrence, before trial, the prosecutor notified defense counsel that the State intended to introduce evidence of the defendant’s nine misdemeanor convictions for negotiating worthless instruments. During re-cross-examination at trial, the prosecutor, without any notice, asked the defendant about other instances of negotiating worthless instruments for which she had not been convicted. Based on the prosecutor’s failure to provide the defense notice under Rule 404(b), defense counsel objected to the questioning about other instances of negotiating worthless instruments and moved for a , mistrial. The State responded that it was not required to give notice under Rule 404(b) because, the State argued, the evidence was admissible as rebuttal evidence. The trial court determined that the evidence regarding the other instances of negotiating worthless instruments was not admissible as rebuttal evidence but denied defense counsel’s motion for a mistrial and gave the jury a curative instruction. On appeal, the Alabama Supreme Court held:
“Even if the evidence of Lawrence’s other acts of negotiating worthless instruments had been admissible as rebuttal evidence, the State’s failure to provide notice that it would offer such evidence renders it inadmissible. Rule 404(b), Ala. R. Evid., is identical to Federal Rule 404(b). The Advisory Committee Note to the 1991 Amendment of Rule 404(b) states:
“ ‘The amendment requires the prosecution to provide notice, regard *201 less of how it intends to use the extrinsic act evidence at trial, ie., during its case-in-chief, for impeachment, or for possible rebuttal.... Because the notice requirement serves as condition precedent to admissibility of 404(b) evidence, the offered evidence is inadmissible if the court decides that the notice requirement has not been met.’
“(Emphasis added.) The Advisory Committee Notes to the federal rules are persuasive authority in our interpretation of the Alabama rules. In addition, the Advisory Committee’s Notes to our Rule 404(b) specifically refer to the federal rule, stating:
“ ‘The “provided” clause of section (b) requires pretrial notice to the accused of the prosecution’s intent to use evidence of collateral misconduct. This “provided” clause is based upon an amendment to the corresponding federal rule adopted in 1991. See Fed.R.Evid. 404(b).’
“Therefore, we hold that Rule 404(b), Ala. R. Evid., like Rule 404(b), Fed. R.Evid., requires that the prosecution ‘provide notice, regardless of how it intends to use the extrinsic-act evidence at trial, i.e., during its case-in-chief, for impeachment, or for possible rebuttal.’
“The State concedes that the Advisory Committee Note to Federal Rule 404(b) indicates that the prosecution must provide notice of other-acts evidence, regardless of how it intends to use that evidence at trial. However, the State argues that the notice requirement of Rule 404(b), Ala. R. Evid., should not be extended to every conceivable use of prior-bad-acts evidence. Rather, the State contends, ‘compliance with the notice requirement should be addressed in light of the State’s reasonably anticipated intent to use prior-bad-acts evidence at the time notice was given.’ State’s brief, p. 20. In this case, four days before the trial, Lawrence requested notice pursuant to Rule 404(b). The prosecution gave notice to Lawrence’s attorney, on the day before the trial began, regarding the nine convictions. On the day of the trial, the prosecutor carried into the courtroom packets containing bad checks for which Lawrence had not been convicted, and she had them ready to use.
“The purpose of the notice requirement in Rule 404(b) is ‘to reduce surprise and promote early resolution on the issue of admissibility.’ Advisory Committee Note to 1991 Amendment, Rule 404(b), Fed.R.Evid. Regardless of whether the prosecutor had any intent to use the prior-bad-acts evidence at the time she gave notice, our Rule 404(b) requires that some notice be given, even ‘during trial if the court excuses pretrial notice on good cause shown.’ Rule 404(b), Ala. R. Evid. Therefore, at a minimum, the prosecutor should have given notice during trial, when it became apparent that evidence of the prior acts would be offered as rebuttal evidence.[1] The trial court would then have had the discretion to determine whether the prosecution had shown good cause for not giving notice before the trial and whether the evidence was admissible. Because the notice requirement serves as a condition precedent to the admissibility of Rule 404(b) evidence, the prosecutor’s failure to give Lawrence notice renders that evidence inadmissible.
*202 Lawrence, 776 So.2d at 53-54 (footnote omitted). The Alabama Supreme Court then proceeded to hold that the trial court did not abuse its discretion in denying the defendant’s motion for a mistrial because the questions regarding the defendant’s prior acts of negotiating worthless instruments did not have the effect of suggesting that she committed the charged offense; that the evidence of the other instances of negotiating worthless instruments was cumulative to the evidence regarding the nine convictions for negotiating worthless instruments; and that the trial court gave a curative instruction to the jury.
In the present case, unlike the situation in Lawrence, the State does not argue that it was not required to give notice under Rule 404(b). Instead, the State contends that it gave adequate notice under Rule 404(b). We agree. Under the circumstances of this case, defense counsel was given reasonable notice of the general nature of the evidence the State intended to introduce. In Lawrence, unlike the present case, the prosecutor asked questions about the defendant’s prior bad acts without providing the defense any notice. In the present case, the prosecutor gave general notice before trial that the State would seek to introduce evidence of the circumstances surrounding the August 13, 1994, incident at Hillock’s apartment. Those circumstances include the way in which Petrie entered Hillock’s apartment, whether he could enter her apartment without using force, and whether he entered her apartment without her permission. Before trial, the State specifically informed defense counsel that it intended to introduce evidence of collateral bad acts related to Petrie’s stalking, threatening,' and making preparations to restrain and murder Hillock. The State further informed defense counsel that it intended to “show the theft by the defendant of Ms. Hillock’s lingerie, keys, and wedding ring.” The substance of defense counsel’s Rule 404(b) objection at trial was that he was completely unaware of the incident in which Petrie made a copy of the keys to Hillock’s apartment without her permission. However, it is undisputed that defense counsel possessed a copy of the transcript of Hillock’s 1994 testimony and that that testimony included references to the incident in which Petrie made a copy of the keys to Hillock’s apartment without her permission. Furthermore, at trial, outside the presence of the jury and before the prosecutor asked any questions concerning the incident in which Petrie made a copy of the keys to Hillock’s apartment without her permission, the State gave notice that it desired to introduce evidence of that specific incident. This action by the State gave Petrie the opportunity to challenge the admissibility of the evidence and gave the trial court the opportunity to resolve the issue of admissibility outside the presence of the jury before the evidence was presented. The hearing held by the trial court on the issue before the jury heard any questions concerning the issue assured that Petrie did not suffer any prejudice. Therefore, we find no merit to Petrie’s claim that he was denied proper notice under Rule 404(b), Ala. R. Evid.
III.
Next, Petrie argues that the trial court erroneously admitted prejudicial hearsay *203 statements numerous times during his trial. At trial, Petrie did not make a timely objection to any of the statements he now challenges on appeal; thus, his arguments concerning these statements are not preserved for appellate review, and these arguments will be reviewed for plain error only. See Rule 45A, Ala. R.App. P.; Wilson, supra.
Rule 801(c), Ala. R. Evid., defines hearsay as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 801(a), Ala. R. Evid., defines a “statement” as “(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.” A “declarant” is simply “a person who makes a statement.” Rule 801(b), Ala. R. Evid. Under Rule 802, Ala. R. Evid., “[hjearsay is not admissible except as provided by these rules, or by other rules adopted by the Supreme Court of Alabama or by statute.”
A.
Petrie first alleges that the trial court improperly admitted prejudicial hearsay evidence regarding O’Rourke’s death. Specifically, Petrie alleges that the trial court improperly allowed Detective Gear to testify about the contents of certain telephone records and about O’Rourke’s missing keys. Petrie further alleges that the trial court improperly allowed Kristen Boster, the forensic scientist who performed DNA testing on certain items that were recovered from O’Rourke’s apartment, to testify that the washcloth recovered from the O’Rourke crime scene was reported to her as having “the highest evidentiary value.”
Concerning the telephone records, Detective Gear testified:
“[Prosecutor]: Now, in the course of your investigation, did you also review Ms. O’Rourke’s phone records?
“A. Yes, I did.
“Q. And did you determine whether there were any calls made to or from her apartment on July the fourth?
“A. Yes.
“Q. And—
“[Defense counsel]: Objection. Hearsay.
“The Court: Overruled. Overruled.
“Q. How many phone calls were made from her home?
“A. One phone call made from her phone in her apartment on that day.
“Q. Do you recall approximately what time that call was made?
“A. Right around 5:09, 5:10 p.m.
“Q. Where was the call made to?
“A. It was made to the residence of Steven Petrie.
“Q. Now, did you determine whether or not there were any calls made after that 5:09 p.m. phone call on the fourth of July?
“A. There were no more calls on the fourth.
“Q. Were there any calls made on the fifth of July?
“A. Yes.
“Q. And, if you would, tell us how many calls were made.
“A. There was one call made on the fifth of July.
“Q. What time was that call made?
“A. That was six minutes after midnight, 12:06 a.m.
“Q. Okay. So just after the fourth of July, six minutes into the fifth?
“A. Yes.
“Q. And where was that call made to?
*204 “A. Made to the residence of one Tina Hillock.”
“Q. Now, did you later determine who Tina was?
“A. Yes, I did.
“Q. Who was she in relation to the defendant?
“A. Steve Petrie’s ex-girlfriend.”
(R. 1403-05.)
Petrie’s counsel objected only to Detective Gear’s testimony that he had reviewed O’Rourke’s telephone records during the course of his investigation and had determined whether any calls were made to or from her . apartment on July 4. In that testimony, however, Detective Gear simply detailed his own actions. The testimony was evidence only of what Detective Gear did. The testimony was not evidence of a statement; thus, it was not hearsay. See White v. State, 900 So.2d 1249, 1261 (Ala.Crim.App.2004) (“His only objection seems to be that Slaton was permitted to testify about hearsay, but Slaton did not testify about what Thompson told him, only that he met Thompson at the location where Newton had testified she met Thompson. Slaton’s testimony about what he did was not hearsay.”).
After Detective Gear testified that he had reviewed O’Rourke’s telephone records and had determined whether any calls were made to or from her apartment, he testified about specific information that he had derived from the telephone records. However, Petrie’s counsel did not object to this testimony; thus, the admission of this testimony will be reviewed for plain error only. Therefore, the burden is on Petrie to establish that an obvious, indisputable error occurred and that the error aversely affected the outcome of the trial. See Wilson, supra.
On appeal, Petrie assumes that the telephone records of calls made • from O’Rourke’s apartment constitute hearsay. Petrie’s argument centers around the inapplicability of Rule 803(6), Ala. R. Evid., which is the business-records exception to the hearsay rule. However, it is not obvious or indisputable that the telephone records of calls made from O’Rourke’s apartment meet the definition of hearsay, which requires an assertive statement. See State v. Carter, 762 So.2d 662, 678-81 (La.Ct.App.2000) (taking judicial notice that telephone records of calls placed by a person using a particular telephone are compiled solely by a computer, not by persons entering information into a computer and accordingly holding that records of calls placed on a telephone could not be considered statements; thus, the records were not hearsay evidence); see also State v. Modest, 88 Wash.App. 239, 944 P.2d 417, 422 (1997) (holding that “[c]learly a telephone bill is not an assertive statement and is not excludable as hearsay”). Because Petrie has failed to establish that the telephone records of calls made from O’Rourke’s apartment contained assertive statements, he has failed to meet his burden of establishing that Detective Gear’s testimony concerning the contents of the telephone records constituted hearsay. Therefore, we find no plain error in this claim.
Moreover, even if Detective Gear’s testimony concerning the contents of the telephone records was hearsay, the admission of that testimony did not rise to the level of plain error because it did not adversely affect Petrie’s substantial rights. The State presented a significant amount of other nonhearsay evidence indicating that Petrie had been in contact with O’Rourke around the time of her death. That evidence included the presence of his DNA at the scene of the crime and the fact that he used or attempted to use O’Rourke’s ATM card on several occasions *205 around the time of her death. Therefore, Detective Gear’s testimony that calls were placed from O’Rourke’s apartment to Pe-trie’s residence and to his ex-girlfriend’s residence was cumulative to other evidence presented, and the admission of Detective Gear’s testimony was not plain error. See Smith v. State, 795 So.2d 788, 814-15 (Ala.Crim.App.2000) (holding that even if the statement of capital-murder defendant’s mother about the defendant’s washing clothes in his mother’s trailer was hearsay, it was cumulative of other evidence presented through the defendant’s own admissions to police, and, thus, the admission of the statement was not plain error).
Next, we address Petrie’s allegation that Detective Gear’s testimony about O’Rourke’s missing keys was inadmissible hearsay evidence. At trial, without objection, Detective Gear testified simply that “there was a set of keys missing” from O’Rourke’s apartment and that the keys “were never recovered.” (R. 1408.) That testimony was the entirety of Detective Gear’s testimony concerning this issue. Detective Gear did not state how he became aware of the existence of the keys or how he became aware that the keys were missing. Detective Gear did not testify about what someone had told him. Detective Gear merely recounted something he had determined during the course of his investigation. Like Detective Gear’s testimony that he had reviewed O’Rourke’s telephone records during the course of his investigation, his testimony concerning the missing keys was not hearsay evidence because it was not evidence of a statement. See White, supra. Therefore, we conclude that Petrie has failed to establish plain error regarding this claim.
Next, Petrie alleges that the trial court erroneously admitted hearsay evidence when the court allowed Boster to testify that the washcloth recovered from the O’Rourke crime scene was reported to her as having “the highest evidentiary value.” At trial, Boster testified:
“[Prosecutor]: Can you tell us—list for us what items were submitted to you for testing?
“[Boster]: ... I also received several what we’d call ‘questioned stains.’ These are stains from the scene of the crime or involved in the. crime. And there [were] two stains from a bedsheet that had semen identified in the stain. There was a blood and semen mixture' from a washrag. And there was a semen stain on a pillowcase.
[[Image here]]
“[Prosecutor]: Of these four items from the crime scene, was there any particular item that you were sort of focusing on?
“[Boster]: Yes.
“[Prosecutor]:' And which item was that?
“[Boster]: The blood and semen stain mixture that was found on the washrag was reported to me as having the highest evidentiary value in this case.
“[Prosecutor]: The washrag had the highest evidentiary value?
“[Boster]: Yes.”
(R. 1472-74.) There was no objection to this testimony; thus, the trial court’s admission of the testimony will be reviewed for plain error only.
Boster’s testimony that “the washrag was reported to [her] as having the highest evidentiary value in this case” was not hearsay. That testimony was not offered to prove the truth of the matter asserted in what was reported to Boster, i.e., that the washcloth had the highest evidentiary value, but for the purpose of explaining why Boster was focusing on a particular item. See Deardorff v. State, 6 *206 So.3d 1205,1216 (Ala.Crim.App.2004) (stating that “[a] statement offered for a reason other than to establish the truth of the matter asserted therein is not hearsay”). Furthermore, to the extent that Boster’s answer of “yes” to the prosecutor’s followup question can be removed from context and interpreted as Boster’s stating that she believed that the washcloth had the highest evidentiary value, that statement is also not hearsay because it is her opinion given while testifying at trial. A statement by a declarant while testifying at trial is not hearsay. Rule 801(c), Ala. R. Evid. Therefore, because Boster’s testimony was not hearsay, no error, plain or otherwise, occurred as a result of the admission of her testimony.
B.
Next, Petrie alleges that certain testimony given by Hillock was inadmissible hearsay. Specifically, Petrie alleges that the trial court improperly allowed Hillock to testify about her conversation with a police officer who arrived at her apartment during the incident involving Petrie. Petrie further alleges that the trial court improperly allowed Hillock to testify that neither she nor her sons had placed the duct tape or the bathrobe belt found in the bedroom of her apartment.
Regarding Hillock’s conversation with the police officer after he arrived at her apartment, Hillock testified:
“[Prosecutor]: Tell us what happened when you opened the door to the police.
“[Hillock]: When I opened the door for the police, I think Steve started going toward the living room. And I was — I just felt so relieved.
“[Prosecutor]: Did you leave your apartment at some point?
“[Hillock]: The officer said, “Why don’t we go outside so you can calm down and then we can talk to you?’
“[Prosecutor]: And did you go outside with the officer?
“[Hillock]: Yes, I did.
“[Prosecutor]: Tell us what happened when you went outside with the officer.
“[Hillock]: It took a while for me to calm down so that I could speak and he could understand me. But he questioned what had happened in the apartment. He had asked me whether or not Steve, I had invited [him] over or if he was there without my invitation. I told him, Yes.’ And I told him that Steve had thrown me around, wouldn’t let me leave the apartment, and that I was fearful of him.”
(R. 1496-97.) There was no objection to this testimony; thus, the admission of the testimony will be reviewed for plain error only.
Petrie alleges that this testimony “was full of out-of-court statements that were offered to prove the truth of the matter asserted, including the statements that (a) Hillock needed to calm down before she could talk, (b) Hillock had not invited Petrie into her apartment, (c) Pe-trie had assaulted Hillock and prevented her from leaving the apartment, and (d) Hillock feared Petrie.” (Petrie’s brief, at 61-62.) However, to the extent that any of this testimony was hearsay, the admission of the testimony was not plain error because the testimony was cumulative to other evidence presented at trial.
“Testimony that may be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred. McFarley v. State, 608 So.2d 430, 433 (Ala.Crim.App.1992); Thompson v. State, 527 So.2d 777, 780 (Ala.Crim.App.1988). Mary Evans’s testimony that Mary En-finger yelled for her to get her gun from *207 under the bed is merely cumulative of evidence that had already been elicited by the appellant’s counsel. Even if Mary Evans’s testimony were inadmissible hearsay, the statement was cumulative of prior evidence and any error that may have resulted was harmless.”
Yeomans v. State, 641 So.2d 1269, 1272-73 (Ala.Crim.App.1993); see also Smith, supra.
In the present case, the testimony Petrie challenges was rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred. First, we will assume that Hillock gave hearsay testimony when she testified concerning the officer’s statement that she might need to calm down before they talked. However, moments later, Hillock testified: “It took a while for me to calm down so that I could speak and he could understand me.” (R. 1497.) This testimony clearly was not hearsay because it was a statement made by the declarant while testifying at trial, and from this testimony the same facts could be inferred, i.e., that Hillock was not calm when the officer arrived. Therefore, Hillock’s subsequent testimony rendered innocuous her earlier testimony concerning the statement made by the officer. Furthermore, when the officer testified at trial, he also gave nonhearsay testimony from which the same facts could be inferred. The officer testified that, “[w]hen [Hillock] opened the door, you could see a very panicked and terrored look on her face” and that “her whole body began shaking as somebody that was just very, very in fear.” (R. 1586.) The officer further testified that Hillock was not able to immediately talk to him and that “[i]t took a few minutes before [he] could get her to even speak anything.” (R. 1587.) Therefore, the officer’s testimony also rendered innocuous Hillock’s testimony concerning the statement made by the officer.
Similarly, assuming that Hillock, gave hearsay testimony when she testified that she told the police officer that she did not invite Petrie into her apartment, the testimony was rendered innocuous by her prior and subsequent lawful testimony to the same effect or from which the same facts can be inferred. (R. 1489-90, 1513.) Therefore, the admission of Hillock’s statement to the officer that she did not invite Petrie into her apartment was not plain error.
Likewise, Hillock’s testimony that she told the police officer that Petrie had thrown her around and would not let her leave the apartment was rendered innocuous by prior lawful testimony to the same effect or from which the same facts can be inferred. Before Hillock testified concerning what she told the police officer when he arrived at her apartment, she had testified in detail about being assaulted by Petrie and about not being able to leave the apartment. (R. 1494 (Hillock testified that “[a]nd just as soon as I opened the door, [Petrie] grabbed me and threw me back inside the apartment on the couch”)); (R. 1495-96 (after being asked whether she made “any other attempts to get out of the apartment,” Hillock testified that “I got up and ran, like, around the cocktail table so I could get out the kitchen door, and he grabbed me again and just threw me back on the couch”)). Therefore, the trial court did not commit plain error by admitting Hillock’s testimony concerning her statement to the officer that Petrie had thrown her around and would not let her leave the apartment.
Furthermore, Hillock’s testimony that she told the police officer that she feared Petrie was rendered innocuous by prior lawful testimony to the same effect *208 or from which it could be inferred that Hillock was fearful of Petrie. For instance, before giving the alleged hearsay testimony, Hillock testified that, during the incident at her apartment, she falsely told Petrie that she was pregnant because she was afraid that Petrie was going to hurt her. (R. 1494-95.) Therefore, to the extent that Hillock’s testimony was hearsay, the trial court did not commit plain error by admitting Hillock’s testimony because it was cumulative to other lawful testimony.
Also, we find no merit in Petrie’s allegation that the trial court improperly allowed inadmissible hearsay testimony when the court allowed Hillock to testify that neither she nor her sons had placed the duct tape or the bathrobe belt found in one of the bedrooms in her apartment. Without any objection based on hearsay, Hillock testified:
“[Prosecutor]: Was there anything found in your apartment that had been moved that you or your sons had not moved or placed in a certain area?
“[Hillock]: Yes. In my—
“[Prosecutor]: What were those items, Tina?
“[Hillock]: It was in my sons’ bedroom on their desk.
“[Prosecutor]: And what were those items?
“[Hillock]: It was a roll of duct tape and the belt to my robe.
“[Prosecutor]: When you say the belt to your robe, can you describe that belt for us?
“[Hillock]: It’s the belt that you tie around your robe to hold it closed. It was made of, like, a cotton material. It was pink and white stripes.
“[Prosecutor]: Where had that belt to your robe been when you last saw it?
“[Hillock]: It had been on my robe in my closet in my bedroom.
“[Prosecutor]: And neither you nor your sons had moved it; correct?
“[Hillock]: No.”
(R. 1499-1500.)
This testimony is not hearsay because it contains only statements made by the de-clarant while she was testifying at the trial. See Rule 801(c), Ala. R. Evid. Pe-trie’s argument appears to be that Hillock’s testimony must necessarily be relaying on an out-of-court statement made by her sons because, Petrie argues, Hillock could not have known whether her sons had placed the duct tape and the belt in the bedroom unless her sons had told her that they did not place the items in the bedroom. However, that argument is simply incorrect. For example, Hillock may have known that her sons did not place the items in the bedroom because they had not been in the apartment since she last saw the robe in her closet or since she last saw the desk on which the items were found. Hillock’s testimony that neither she nor her sons had moved the belt from her closet does not necessarily rely on an out-of-court statement from her sons. Therefore, Hillock’s testimony is not hearsay, and the trial court did not commit plain error by allowing the testimony.
IV.
Next, Petrie alleges that the trial court misapplied Rule 412, Ala. R. Evid., Alabama’s rape-shield rule, to prevent him from presenting evidence rebutting certain aspects of the State’s case. Specifically, Petrie alleges that he should have been allowed to present evidence indicating that Lim was separated from her husband at the time of her death and evidence indicating that Lim was employed as an exotic dancer.
*209 Rule 412(b), Ala. R. Evid., provides: “In any prosecution for criminal sexual conduct or for assault with intent to commit, attempt to commit, or conspiracy to commit criminal sexual conduct, evidence relating to the past sexual behavior of the complaining witness ... shall not be admissible, either as direct evidence or on cross-examination of the complaining witness or of other witnesses, except as otherwise provided in this rule.” A “complaining witness” is defined as “[a]ny person alleged to be the victim of the crime charged, the prosecution of which is subject to the provisions of this rule.” Rule 412(a)(1), Ala. R. Evid. Under Rule 412(a)(3), Ala. R. Evid., evidence relating to the past sexual behavior of the complaining witness “includes, but is not limited to, evidence of the complaining witness’s marital history, mode of dress, and general reputation for promiscuity, non-chastity, or sexual mores contrary to the community standards and opinion of character for those traits.”
A.
Petrie alleges that he should have been allowed to present evidence indicating that Lim was separated from her husband because, Petrie says, this evidence would have rebutted Lim’s mother’s testimony that Lim’s wedding rings were missing from her apartment after her death. According to Petrie, the evidence indicating that Lim was separated from her husband would “show the jury that Lim had reason to not be wearing her wedding ring.” (Petrie’s brief, at 67.)
First, after reviewing the record, we find that the trial court never prevented Petrie from presenting evidence indicating that Lim was separated from her husband; thus, Petrie’s argument, on its face, is without merit. During the examination of Lim’s mother at trial, outside the presence of the jury, defense counsel moved the trial court to allow him to question Lim’s mother concerning Lim’s marital history. (R. 916.) In making that motion, defense counsel asked: “Now, is that going to run afoul of the rape shield right there?” (R. 916.) Defense counsel also provided the trial court with a copy of the rape-shield rule, and the trial court read the rape-shield rule into the record. (R. 916-18.) The State then argued that questioning Lim’s mother concerning Lim’s marital history would violate the rape-shield rule. (R. 918.) Immediately after the State made its argument, the following exchange occurred:
“[Defense counsel]: I just wanted to clarify that, you know.
“The Court: All right.
“[Defense counsel]: So I won’t ask any questions about that.
“[Prosecutor]: Thank you.”
(R. 918.) Nothing else was recorded concerning questioning Lim’s mother about Lim’s marital history, and, when the examination of Lim’s mother continued, nobody attempted to ask Lim’s mother any questions about Lim’s marital history.
After Petrie had appealed his conviction to this Court, Petrie’s counsel filed a motion to “supplement the record with missing bench conferences and hearings.” The trial court then entered “an order instructing Mr. Petrie’s appellate attorneys to discuss with trial counsel for both parties any unrecorded proceedings in an attempt to reach an agreement as to the content of said proceedings.” (3d Supp. C. 26.) After that order was issued, the State submitted a response that included a “Statement of Unrecorded Proceedings and Evidence” that was prepared by Petrie’s appellate counsel, and the trial court “accepted] said statement as proof of what occurred at the unrecorded proceedings requested to be included in the record on appeal by *210 Mr. Petrie’s appellate attorneys.” Id. That “Statement of Unrecorded Proceedings and Evidence” states, in part:
“R. 922 — bench conference held outside the court reporter’s hearing. [The prosecutor] informed the trial court that his next witness, the decedent’s roommate, was not immediately available to testify. Defense counsel reiterated their objection to the portion of the court’s Rape Shield ruling that precluded the defense from asking questions regarding the decedent’s marital history (previously noted at R. 916-18). Defense counsel explained that the ruling violated Mr. Petrie’s right to present a defense, and it was necessary to tell the jury that the decedent’s husband had been deported to explain that the decedent may not have been wearing her wedding rings and may have been engaging in consensual romantic relationships with men other than her husband.”
(3d Supp. C. 71-72.) This unrecorded bench conference is noted in the record as occurring after Lim’s mother had been excused as a witness. (R. 922.)
Contrary to Petrie’s allegation on appeal, nowhere in the record is there evidence that the trial court prevented Petrie from presenting evidence indicating that Lim was separated from her husband when she was murdered. Petrie’s trial counsel voluntarily withdrew his motion to present evidence indicating that Lim was separated from her husband. (R. 918.) The trial court did not make a ruling on that motion. Id. Assuming that the information regarding the unrecorded bench conference is correct, during that bench conference defense counsel purportedly reiterated his objection to the trial court’s “rape-shield ruling” that was “previously noted at R. 916-18.” However, there is no “rape-shield ruling” by the trial court anywhere in the record, including pages 916-18 of the reporter’s transcript. Furthermore, the statement of the unrecorded bench conference does not indicate that the trial court made a ruling during that unrecorded bench conference. Therefore, because defense counsel voluntarily withdrew his motion and because there is no evidence that the trial court ever made a ruling on the motion, the trial court never applied the rape-shield rule or prevented Petrie from presenting evidence indicating that Lim was separated from her husband; thus, Petrie’s argument to the contrary is without merit on its face.
Moreover, even if the trial court prevented Petrie from presenting evidence indicating that Lim was separated from her husband or if Petrie’s trial counsel mistakenly failed to obtain a ruling from the trial court concerning the admissibility of that evidence, no error, much less plain error, occurred because that evidence was simply irrelevant and would not have rebutted Lim’s mother’s testimony that Lim’s wedding rings were missing from her apartment after her death.
Rule 401, Ala. R. Evid., defines “relevant evidence” as “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Under Rule 402, Ala. R. Evid., “[e]vidence which is not relevant is not admissible.” Furthermore, “[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.” Rule 408, Ala. R. Evid.
In the present case, Lim’s mother testified that she “knew” Lim was in possession of her wedding rings. (R. 893-94.) We will assume for the sake of argument *211 that, as Petrie suggests, one can infer that a woman might be less likely to wear her wedding rings if she is separated from her husband. However, Lim’s mother did not testify that Lim was wearing her wedding rings. Lim’s mother testified only that Lim was in possession of her wedding rings and that, after her death, they were missing from her apartment. Evidence that Lim was separated from her husband does not have any tendency to rebut the testimony of Lim’s mother. Whether Lim’s wedding rings were taken from her finger or from some location in the apartment is irrelevant. If the jury decided that Lim was not in possession of her wedding rings based solely on the fact that she was separated from her husband, that decision would be based on pure speculation. Therefore, the evidence indicating that Lim was separated from her husband was not relevant and, thus, was not admissible. Consequently, even if the trial court prevented Petrie from presenting that evidence or if Petrie’s trial counsel failed to obtain a ruling from the trial court concerning the admissibility of that evidence, no reversible error occurred.
B.
Petrie also argues that the trial court misapplied Alabama’s rape-shield rule to prevent him from presenting evidence indicating that Lim was employed as an exotic dancer at the time of her death. According to Petrie, that evidence would have rebutted Dr. Simmons’s testimony that some of the round bruises on Lim’s leg could have been caused by fingers grabbing Lim’s leg. Petrie alleges that evidence indicating that Lim was employed as an exotic dancer would offer an alternative explanation for the bruising on Lim’s leg.
Petrie appears to concede that under the rape-shield rule, evidence indicating that the complaining witness was an exotic dancer would normally be inadmissible. However, as Petrie notes, “to read Rule 412 as requiring an absolute exclusion of all evidence of past sexual activity between the victim and third persons could, in some cases, violate a criminal defendant’s constitutional rights,” and, thus, “when Rule 412 is applied to preclude the admission of particular exculpatory evidence, the constitutionality of its application is to be determined on a case-by-case basis.” Ex parte Dennis, 730 So.2d 138, 141 (Ala.1999). Petrie relies exclusively on Dennis to support his argument.
In O.A.C. v. State, 851 So.2d 146 (Ala.Crim.App.2002), this Court was asked to determine whether the trial court abused its discretion in restricting evidence of the rape victim’s extramarital affairs. In deciding that the trial court did not abuse its discretion, this Court examined Dennis and held, as follows:
“[I]n Dennis, the Alabama Supreme Court held that Rule 412 does not necessarily preclude all evidence of the past sexual behavior of the victim. In Dennis, the appellant was convicted of the first-degree rape of his then 11-year-old daughter. Testifying for the prosecution, a medical doctor ‘stated unequivocally that, in his opinion, [the victim’s] condition was caused by recurrent penetration rather than by a one-time occurrence.’ 780 So.2d at 139. In an attempt to rebut that testimony and to establish his innocence, the appellant sought to introduce evidence indicating that someone else had had sexual intercourse with the victim. Specifically, the appellant sought to introduce testimony from C.M., who testified out of the presence of the jury that she had seen another adult male engaging in sexual contact — and possibly intercourse — with the *212 victim. The trial court ruled that C.M.’s testimony was inadmissible under Rule 412 because either it was not probative or its prejudicial effect and tendency to confuse the jury substantially outweighed any probative value it might have. The Alabama Supreme Court upheld the trial court’s ruling that the evidence was inadmissible, finding, among other things, that the prejudicial effect of the evidence outweighed' its probative value. However, in doing so, the Court noted the following:
[[Image here]]
“ ‘... [OJther states and the federal courtSj perhaps anticipating a constitutional argument similar to Dennis’s, have made express exceptions permitting the introduction of evidence of the victim’s sexual history where it is offered to rebut or to explain away scientific or medical evidence offered by the prosecution in a rape case. See Fed.R.Evid. 412....
“ ‘Moreover, the exception in Rule 412, Fed.R.Evid., was apparently included in the federal rule because of the outrage over this State’s now infamous prosecutions of the “Scottsboro nine” in the 1930s. See 21 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5388, pp. 590-598 (1980) (hereinafter “Wright & Graham”). In fact, the exception in the federal rule is known as the “Scottsboro exception,” or a recognition of the “Scottsboro rebuttal.” Id. at 590-91. The trials of the Scottsboro nine serve as an excellent reminder of the need for such an exception.
‘“In the “Scottsboro cases,” nine black men were accused of raping two white women on a freight train while it was traveling through northern Alabama. A key piece of circumstantial evidence offered on behalf of the prosecution in the defendants’ first trial was medical testimony indicating that small amounts of semen had been found in the vagina of each woman. The defendants attempted to offer evidence in rebuttal to prove that these women had had sex the night before the alleged rapes, and, therefore, that the defendants were not the source of the semen. This rebuttal evidence was important because the small amount and the nonmotile condition of the semen found in the women was inconsistent with their account of a “gang rape” that the women had alleged had occurred on the day they were examined, and because the only other evidence in the trial was the testimony of the alleged victims. The trial court, however, excluded the rebuttal evidence on its own motion and scathingly chastised the defendants’ lawyer for attempting to introduce it. Several of the defendants were later found guilty. Some of the defendants’ convictions were overturned, and other defendants were released when it was later determined that the women were lying about the rape to cover up for their own “hoboing.” ...
“ ‘We agree with the other jurisdictions that the “Scottsboro exception” is not only wise, but is constitutionally required in some cases in which the prosecution offers evidence to show that a physical injury or condition of the victim indicates that the defendant committed the offense of rape.
“ ‘Of course, the “Scottsboro rebuttal” evidence would not be relevant in a prosecution in which the defendant claims that the victim consented to intercourse, because, in such a case, the defendant admits to being the source of the physical condition. *213 Also, the evidence is admissible only to rebut physical evidence offered by the prosecution; it is not freely admissible by the defendant. In addition, the evidence offered by the defendant to rebut the prosecution’s evidence cannot be “reputation” or “opinion” evidence that would be prohibited by Rule 412, Ala. R. Evid., and it must satisfy the other applicable rules of evidence.’
“Id. at 141-42 (emphasis added).
“In Ex parte Griffin, 790 So.2d 351 (Ala.2000), the Alabama Supreme Court, addressing a different issue, stated:
“ ‘The United States Supreme Court has held that a defendant has a right to put on a defense and that that right includes the opportunity to present evidence proving that another person committed the offense for which he has been charged. See Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920,18 L.Ed.2d 1019 (1967). However, this right is not absolute; instead, the trial court will have to consider the admissibility of such evidence in conjunction with other legitimate interests involved in the trial process. Chambers, 410 U.S. at 295; see also Guam v. Ignacio, 10 F.3d 608 (9th Cir.1993). As a result, the trial court is presented with a balancing test in order to determine whether the evidence of a third party’s culpability is properly admissible.’
“790 So.2d at 353 (emphasis added). In Griffin, the question was whether the appellant should have been permitted to introduce hearsay evidence tending to show that someone else had pleaded guilty to committing the crime for which the appellant was on trial. The Supreme Court answered the question in the affirmative, concluding that the appellant’s constitutional right to present a defense superseded the hearsay rule.
“Similarly, in Adams v. State, 821 So.2d 227 (Ala.Crim.App.), cert. denied, 821 So.2d 227 (Ala.2001), this Court held that the trial court had unconstitutionally prevented the appellant from presenting a defense. In Adams, the appellant was pulled over because the light that illuminated her tag was not working. The arresting officer took the appellant’s driver’s license information and then placed the appellant in the back of his patrol car because he believed she was a ‘flight risk.’ Id. at 228. After determining that the appellant’s driver’s license had been suspended, the arresting officer removed the appellant from his patrol car and had her stand on the sidewalk while he removed his backseat and searched his patrol car. He claimed to have discovered a bag of crack cocaine, and the appellant was charged with possession of a controlled substance. At trial, in an attempt to show that she had been set up and targeted by the police, the appellant sought to introduce evidence indicating, among other things, that approximately three months before the traffic stop, she had filed a rape complaint against another police officer who worked in the same precinct with the arresting officer. The trial court granted the State’s motion in limine to exclude this evidence. This Court reversed, holding that the trial court had abused its discretion and had deprived the defendant of her right to present a defense:
“ ‘ “The right to testify on one’s own behalf at a criminal trial has sources in several provisions of the Constitution. It is one of the rights that ‘are essential to due process of law in a fair adversary process.’ Faretta v. California, 422 U.S. 806, 819 n. 15, 95 *214 S.Ct. 2525, 2533 n. 15, 45 L.Ed.2d 562 (1975). The necessary ingredients of the Fourteenth Amendment’s guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony:
“' “ ‘A person’s right to reasonable notice of a charge against him, and an opportunity to be heard in his defense — a right to his day in court — are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel.’ (Emphasis added [in Rock ].) In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948).
[[Image here]]
“'"The right to testify is also found in the Compulsory Process Clause of the Sixth Amendment, which grants a defendant the right to call “witnesses in his favor,’ a right that is guaranteed in the criminal courts of the States by the Fourteenth Amendment. Washington v. Texas, 388 U.S. 14,17-19, 87 S.Ct. 1920, 1922-1923, 18 L.Ed.2d 1019 (1967). Logically included in the accused’s right to call witnesses whose testimony is ‘material and favorable to his defense,’ United States v. Valenzuela-Bernal, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982), is a right to testify himself, should he decide it is in his favor to do so. In fact, the most important witness for the defense in many criminal cases is the defendant himself. There is no justification today for a rule that denies an accused the opportunity to offer his own testimony. Like the truthfulness of other witnesses, the defendant’s veracity, which was the concern behind the original common-law rule, can be tested adequately by cross-examination. See generally Westen, The Compulsory Process Clause, 73 Mich. L.Rev. 71, 119-120 (1974).
“ ‘ “Moreover, in Faretta v. California, 422 U.S., at 819, 95 S.Ct., at 2533, the Court recognized that the Sixth Amendment
“ ‘ “ ‘grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be “informed of the nature and cause of the accusation,” who must be “confronted with the witnesses against him,” and who must be accorded “compulsory process for obtaining witnesses in his favor.” ’ (Emphasis added [in Rock ].)
“ ‘ “Even more fundamental to a personal defense than the right of self-representation, which was found to be ‘necessarily implied by the structure of the Amendment,’ ibid., is an accused’s right to present his own version of events in his own words. A defendant’s opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness.
[[Image here]]
“ ‘ “Just as a State may not apply an arbitrary rule of competence to exclude a material defense witness from taking the stand, it also may not apply a rule of evidence that permits a witness to take the stand, but arbitrarily exclude material portions of his testimony....
“ ‘ “Of course, the right to present relevant testimony is not without limitation. The right ‘may, in appropriate cases, bow to accommodate other legitimate interests in the criminal *215 trial process.’ [Chambers v. Mississippi, 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).]” ’
“821 So.2d at 234-235, quoting Rock v. Arkansas, 483 U.S. 44, 51-52, 55, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (last emphasis added).
“The common theme running throughout the Alabama Supreme Court’s opinions in Griffin and Dennis, and this Court’s recent opinion in Adams, is the necessity of applying a balancing test. In determining whether the exclusion of evidence violates an accused’s constitutional right to present a defense, the trial court and this Court must balance the right of an accused to present a defense against other interests in the trial process. In this case, we must balance the right of the appellant to present his defense that the accusations against him were false against the policy of this State to protect victims of sexual crimes from being ‘ “harassed] and hu-miliat[ed]” ’ in attempts to ‘ “divert the attention of the jury to issues not relevant to the controversy.” ’ Moseley v. State, 448 So.2d 450, 456 (Ala.Crim.App.1984), quoting People v. Cornes, 80 Ill. App.3d 166,175, 35 Ill.Dec. 818, 825, 399 N.E.2d 1346,1353 (1980).
“We find no abuse of the trial court’s discretion in preventing the appellant from questioning the victim about whether she had had extramarital affairs or from testifying himself that the victim had admitted to him that she had had extramarital affairs. In this respect, we note that the appellant did not proffer evidence to ‘rebut physical evidence offered by the prosecution,’ as discussed in Dennis, and he did not proffer evidence suggesting that a third party had committed the charged offenses, as was the situation in Griffin. Moreover, the victim testified that she told the appellant she had had affairs with two men only because the appellant was beating her at the time and had threatened to kill her if she did not confirm the names of the people he thought she was having an affair with. The appellant denied that he was beating the victim when she made the statement. The victim further testified that the appellant suggested the names of two men, only one of whom she recognized. The appellant denied suggesting any names to the victim. However, no evidence was proffered as to whether one of the men, G.K. (whose name was provided either by the victim, with no suggestion from the appellant, or by the appellant, depending on which version of the events is believed) even exists, and no evidence was proffered as to whether the two men alleged by the appellant to have engaged in extramarital affairs with the victim actually did so. Likewise, the appellant offered no explanation as to what efforts, if any, he had made to identify and locate either man for questioning. Therefore, with the record in this posture, we conclude that the appellant failed to make the necessary threshold showing that the evidence he sought to introduce was sufficiently probative with respect to his claimed defense, so as to tip the balance in favor of admitting the evidence on the basis of his constitutional right to present a defense. The Alabama Supreme Court noted in both Dennis and Griffin that not in every case will the defendant’s right to present his defense be paramount. In Griffin, the Court specifically stated that the constitutional right to present a defense ‘will supersede [the hearsay rule] only in those cases that ... have a probative alternative theory of culpability and not an alternative theory that is merely speculative and meant only to confuse the *216 jury.’ 790 So.2d at 355. The testimony proffered by the appellant with respect to the rape and sodomy charges was speculative, at best. In our view, this kind of inconclusive - evidence that, in effect, tends to be confusing and to raise more questions than it answers, falls squarely within the protective policy considerations of the rape-shield law — to protect victims of sexual crimes from being harassed and humiliated in an attempt to divert the attention of the jury to issues not relevant to the controversy. Furthermore, the victim’s testimony on cross-examination would clearly have been detrimental to the appellant in that she would have testified that she had stated that she was having extramarital affairs only because she was being severely beaten at the time she made the statement.”
O.A.C., 851 So.2d at 148-52.
In the present case, when asked whether certain bruises on Lim’s leg appeared to be “consistent with anything,” Dr. Simmons testified:
“[Dr. Simmons]: Well, there are round bruises. I can’t say what caused them per se, other than you can see the shape of them.
“[Prosecutor]: Do they appear to you to be consistent with bruises that could have been caused by fingerprints from a grabbing manner?
“[Dr. Simmons]: Yes. That’s one explanation. Yes, sir.”
(R. 1085.)
Outside the presence of the jury, defense counsel moved to present evidence indicating that Lim was an exotic dancer. According to defense counsel, this evidence would offer a possible explanation for the presence of the round bruises on Lim’s leg. (R. 1126.) The trial court then allowed defense counsel to question Dr. Simmons outside the presence of the jury concerning this issue. During that examination, Dr. Simmons testified:
“[Defense counsel]: If you were dancing around a pole here, is that possible that bruising right here (indicating) could come from that? Or is that just strictly blood settling?
“[Dr. Simmons]: Let me see the picture, please.
“[Defense counsel]: Yeah, sure. And these two, too (indicating).
“[Dr. Simmons]: If you’re referring to this line here and this blanching (indicating), again, you know, that’s — I think that’s lividity. If you look at the scene picture, she’s laying on her side with these sheets here. This is lividity.
“Now, this stuff — these bruises here I’ve alluded to earlier, one on her hip and one her thigh and below the knee, as I said earlier, I can’t tell you. It could have been caused by fingers. I can’t tell you what caused them. As I testified to earlier, what causes a bruise is that trauma breaks a blood vessel and blood leaks out. So it does not have a pattern per se, so I don’t swear to this Court what caused it.
“[Defense counsel]: I understand. That’s what I want. But you’re saying you also can’t tell us that these other bruises are caused by fingers?
“[Dr. Simmons]: It’s the same. They are round. Fingers do cause round bruises. But so do other things.”
(R. 1127-28.)
Defense counsel then stated: “Again, in all due respect. Your Honor, I mean, in the line of work she was in, people touched her.” (R. 1128.) The trial court ruled that defense counsel’s argument was based upon “complete speculation” and that there was “no evidence” to support defense counsel’s argument. (R. 1129.) The trial court instructed defense counsel that *217 he could not present evidence indicating that Lim was an exotic dancer, but defense counsel could “make it clear to the jury that those bruises could get there by any means.” (R. 1130.)
We hold that the trial court did not abuse its discretion in preventing Petrie from presenting evidence indicating that Lim was an exotic dancer. Petrie failed to proffer any evidence to “rebut physical evidence offered by the prosecution,” as discussed in Dennis. Dr. Simmons testified that one possible explanation for the round bruises on Lim’s leg could be fingers grabbing her leg. However, Dr. Simmons specifically testified that he could not say what caused the bruises, and Petrie was allowed to cross-examine Dr. Simmons and “make it clear to the jury that those bruises could get there by any means.” Petrie merely wanted to show the jury that Lim was an exotic dancer. He did not proffér any evidence showing that her occupation as an exotic dancer actually caused the round bruises on her leg. Therefore, we conclude that, like the appellant in O.A.C., Petrie “failed to make the necessary threshold showing that the evidence he sought to introduce was sufficiently probative with respect to his claimed defense, so as to tip the balance in favor of admitting the evidence on the basis of his constitutional right to present a defense.” 851 So.2d at 152. As the trial court concluded, Petrie’s theory that the round bruises on Lim’s leg were caused by her occupation as an exotic dancer is completely speculative. Thus, concerning this issue, because Petrie’s theory is, at best, speculative and would serve only to confuse the jury, Petrie’s constitutional right to present a defense does not supersede the protections of the rape-shield rule. Evidence indicating merely that Lim was an exotic dancer would serve only to demean the victim and to divert the attention of the jury to irrelevant issues. The trial court did not abuse its discretion in preventing Petrie from presenting that evidence.
V.
Next, Petrie argues that the trial court erroneously allowed Angelo Della Manna, the chief of forensic biology for the Alabama Department of Forensic Sciences, to testify that the semen recovered from Lim’s body originated from the “putative perpetrator.” Petrie argues that because earlier testimony indicated that the DNA profile of that semen matched his DNA profile, Della Manna was implicitly referring to Petrie as the “putative perpetrator.” According to Petrie, Della Manna’s use of the term “putative perpetrator” to implicitly describe Petrie “stripped Petrie of the presumption of innocence and invaded the sole province of the jury.” (Petrie’s brief, at 80.) Specifically, Petrie alleges that Della Manna’s use of the term “putative perpetrator” improperly implied Pe-trie’s guilt and violated Rule 704, Ala. R. Evid. Petrie states that Della Manna’s testimony was particularly prejudicial because of his position as the chief of forensic biology. At trial, Petrie did not object to Della Manna’s use of the term “putative perpetrator”; thus, the admission of that part of his testimony in which he uses that term will be reviewed for plain error only. See Rule 45A, Ala. R.App. P.; Wilson, supra.
‘“The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.’ ” Estelle v. Williams, 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976) (quoting Coffin v. United States, 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481 (1895)).
*218 Rule 704, Ala. R. Evid., states: “Testimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue to be decided by the trier of fact.” “‘An ultimate issue has been defined as the last question that must be determined by the jury.’ ” Fitch v. State, 851 So.2d 103, 116 (Ala.Crim.App.2001) (quoting Tims v. State, 711 So.2d 1118, 1125 (Ala.Crim.App.1997)). Furthermore, in Fitch, this Court recognized that when the testimony at issue is given by an expert, Rule 704 must be read in conjunction with Rule 702(a), Ala. R. Evid., which provides: “If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.” See Fitch, 851 So.2d at 117.
In Fitch, this Court also noted:
“This Court has said:
“ ‘Rule 704, Ala. R. Evid., provides that “[tjestimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue to be decided by the trier of fact.” However, in the case of expert testimony, enforcement of this rule has been lax. C. Gamble, Gamble’s Alabama Rules of Evidence § 704 (1995). We have noted previously in Travis v. State, 776 So.2d 819 at 849 (Ala.Cr.App.1997), that expert testimony as to the ultimate issue should be allowed when it would aid or assist the trier of fact, and the fact that “ ‘ “a question propounded to an expert witness will elicit an opinion from him in practical affirmation or disaffirmation of a material issue in a case will not suffice to render the question improper” ’ ” (citations omitted); see also Rule 702, Ala. R. Evid. (stating that expert testimony should be allowed when it will aid or assist the trier of fact).’
“Henderson v. State, 715 So.2d 863, 864-65 (Ala.Crim.App.1997).”
Fitch, 851 So.2d at 117.
In the present case, Della Manna did not perform any of the DNA testing. However, Della Manna testified concerning the process of entering DNA profiles into the CODIS, and he was generally aware of the DNA testing that was performed in the present case. At trial, Della Manna was accepted as an expert in forensic biology. (R. 1300.) Della Manna testified that DNA profiles must meet both quality and relevancy requirements before they can be entered into the CODIS. He testified that “only the putative perpetrator and individuals who by statute are required to give a sample” are included in the CODIS. (R. 1307.) When asked to define the term “putative perpetrator,” Della Manna testified: “The term ‘putative perpetrator,’ as defined in the national procedures, refers to the DNA traits that through scientific evidence you can associate with the act at hand, the case that you’re looking at.” (R. 1307.) Later, Della Manna explained that DNA that is “relevant to the act at hand” means “the comparison of samples taken directly from the victim that you can associate a definite time frame with versus a sample on a blanket that you can’t associate a time frame with.” (R. 1350.) Della Manna confirmed that the DNA profile of the semen recovered from Lim’s body was entered into the CODIS. During cross-examination by the defense, the following exchange occurred:
“[Defense counsel]: Anyway, when you say — and this works around that concept of putative. If you find something from that initial test that is from the rape kit and it identifies with some *219 body, then you’re saying that person is a possible putative suspect; is that right?
“[Della Manna]: That’s correct.
[[Image here]]
“[Defense counsel]: But you’re using this as kind of like a term of art. You use putative. Now, at that point, your test shows that that person I’ll say may or may not — in this case, may or was or did have sex with that person. All right. But when you say ‘putative,’ now that doesn’t imply that there was some criminal intent at that point, does it?
“[Della Manna]: It just implies that the semen that is recovered is, from the DNA standpoint in accordance with the national procedures, attributable to what is termed the ‘putative perpetrator.’
“[Defense counsel]: In no way — it’s just there and attributable to that person? That’s all you’re saying?
“[Della Manna]: The semen.
“[Defense counsel]: Yeah.
“[Della Manna]: That’s correct.”
(R. 1320-21.)
This Court finds that Della Manna did not use the phrase “putative perpetrator” as a condemnation of Petrie or as an opinion on his guilt but as part of an explanation of why the DNA profile of the semen recovered from Lim’s body was entered into the CODIS. Della Manna throughly explained the technical definition of the term “putative perpetrator,” and defense counsel explicitly recognized the term as “a term of art.” Even if Della Manna’s expert testimony had embraced an ultimate issue to be decided by the trier of fact, and we conclude that it did not, the testimony assisted the jury in understanding the evidence and in reaching its resolution of the case. In this context, we cannot reasonably say that the use of the term “putative perpetrator” adversely affected Petrie’s substantial rights. Contrary to Petrie’s allegation, Della Manna’s use of the term “putative perpetrator” did not strip Petrie of his presumption of innocence or invade the province of the jury. Therefore, we hold that the trial court did not commit plain error in admitting Della Manna’s testimony.
VI.
Next, Petrie argues that the trial court committed plain error by admitting what he says is unreliable DNA evidence. Specifically, Petrie alleges that the DNA evidence linking him to the crime scene was produced by an unproven technique and that “the trial court admitted testimony claiming a ‘match’ between Petrie and DNA from the crime scene without any evidence establishing the statistical significance of the match.” (Petrie’s brief, at 81-82.) Petrie did not challenge the admissibility of this DNA evidence at trial; thus, we will review the admission of the DNA evidence for plain error only. See Rule 45A, Ala. R.App. P.; Wilson, supra.
A.
Petrie alleges that the trial court committed plain error by admitting the DNA evidence linking him to the crime scene because, he says, the State generated the DNA profiles using a system named “Identifiler” but failed to show that evidence generated using the Identifiler system is reliable under § 36-18-30, Ala.Code 1975. Section 36-18-30 provides:
“Expert testimony or evidence relating to the use of genetic markers contained in or derived from DNA for identification purposes shall be admissible and accepted as evidence in all cases arising in all courts of this state, provided, however, the trial court shall be satisfied that the expert testimony or evidence meets the criteria for admissibility as set forth by the United States Supreme *220 Court in Daubert, et ux., et al., v. Merrell Dow Pharmaceuticals, Inc., decided on June 28,1993.”
In Turner v. State, 746 So.2d 355 (Ala.1998), the Alabama Supreme Court stated:
“We hold that if the admissibility of DNA evidence is contested, the trial court must hold a hearing, outside the presence of the jury, and, pursuant to § 36-18-30, determine whether the proponent of the evidence sufficiently establishes affirmative answers to these two questions:
“I. Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA forensic evidence is based ‘reliable’?
“II. Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA evidence is based ‘relevant’ to understanding the evidence or to determining a fact in issue?
“Trial courts should use the flexible Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993),] analysis in making the ‘reliability’ (scientific validity) assessment. In making that assessment, the courts should employ the following factors: (1) testing; (2) peer review; (3) rate of error; and (4) general acceptance.”
746 So.2d at 361 (footnotes omitted).
In the present case, Dodd testified that the DNA profiles linking Petrie to the crime scene were generated in 2004 using “a system called Identifiler” that “allowed us to look at sixteen different areas of the DNA molecule.” (R. 1235.) Dodd also stated that the Identifiler system is the system the Alabama Department of Forensic Sciences currently uses. (R. 1235.) Dodd also briefly described the current DNA-analysis process. (R. 1230-31.) Dodd then presented testimony concerning the results of the DNA testing. The defense did not contest the admissibility of the DNA evidence, and the trial court did not hold a hearing to determine the reliability of the DNA evidence.
After Dodd had finished testifying, at the request of defense counsel, the defense and the prosecution agreed to admit into evidence a laboratory report prepared by a DNA expert for the defense. (R. 1279-82, 1296-97.) The report was marked as both a State’s exhibit and a defendant’s exhibit. (C. 532.) The DNA testing for that report also used the Identifiler system. (C. 536.) The results of that report did not contradict the results of Dodd’s testing. Both Dodd and the expert for the defense concluded that the DNA profile of the semen donor on the vaginal swab of Lim’s body matched Petrie’s DNA profile. (R. 1243-44, 1250-51; C. 537-38.) The defense expert also concluded that Petrie’s DNA was present in stains on a blanket that was recovered from the crime scene. (C. 537.)
We conclude that Petrie has failed to establish that the trial court committed plain error by failing to require the State to show the reliability of the “Identifiler” system. Petrie has failed to establish plain error because he has failed to establish that any error that occurred adversely affected the outcome of the trial. The results of the State’s DNA testing that connected Petrie to the crime scene were merely cumulative of the results of Petrie’s expert’s DNA testing, which also connected Petrie to the crime scene. Furthermore, the DNA testing performed by the defense’s expert relied on the same “Identifi-ler” system that was used by the State; thus, the defense conceded at trial the reliability of the system. Therefore, we find that Petrie’s substantial rights were not adversely affected by the trial court’s *221 admission of the State’s DNA evidence obtained using the “Identifiler” system; thus, the trial court did not commit plain error.
B.
Petrie also alleges that the trial court committed plain error by admitting testimony claiming a “match” between Pe-trie’s DNA profile and DNA obtained from the Lim and O’Rourke crime scenes -without any evidence establishing the statistical significance of the matches. Specifically, Petrie alleges that “[t]his testimony affirmatively misled the jury into believing that Petrie could be conclusively linked to each of these crime scenes because the prosecution presented no evidence establishing the statistical significance of the matches.” (Petrie’s brief, at 85.)
This Court has explained:
“[T]here are two types of DNA evidence: matching evidence and population-frequency-statistical evidence. In terms of criminal law, matching evidence indicates whether the DNA from a given sample (such as a sample of biological fluid from a crime scene) is the same as a suspect’s DNA. If the DNA is not the same, then the suspect is excluded as having contributed that sample to the crime scene. If the DNA is the same, then the suspect is included as having possibly contributed that sample to the crime scene; however, the suspect is not positively identified as the contributor to the sample. Because only certain regions of the DNA molecule are analyzed and used for comparison, rather than the whole molecule, it is possible that more than one person has the same sequence in the same region (mtDNA) or the same size region (nuclear DNA). Because a ‘match’ is not, by itself, a positive identification of an individual, the significance of that match must be calculated. Population-frequency-statistical evidence is evidence of the frequency with which a particular sequence or size in a particular region is found in the population as a whole and it establishes the significance of the matching evidence.”
Lewis v. State, 889 So.2d 623, 668-69 (Ala.Crim.App.2003).
In the present case, concerning the DNA results from the cigarette butts found in Lim’s apartment, Dodd testified that “three of the cigarette butts match the profile from Mr. Petrie.” (R. 1243.) Concerning the vaginal swab of Lim’s body, Dodd testified that “the semen donor on the vaginal swab matched the DNA profile of Steven Petrie.” (R. 1244.) Dodd did not give any population-frequency-statistical testimony. However, the defense expert’s laboratory report contained DNA-statistical analysis of the various samples from the Lim crime scene that were tested. (C. 539-40.) For example, concerning the semen donor on the vaginal swab, the defense expert’s report states that the DNA profile originated from Pe-trie and that “the estimated frequency of occurrence of this genetic profile at thirteen loci in five North American populations is: 1 in 17.87 quintillion unrelated [Black] individuals; 1 in 485.9 quadrillion unrelated [Caucasian] individuals; 1 in 267.7 quadrillion unrelated [Southwest Hispanic] individuals; 1 in 235.8 quadrillion unrelated [Southeast Hispanic] individuals; 1 in 4.63 quintillion unrelated [General Asian] individuals.” (C. 539-40.)
Concerning the Lim crime scene, we find no merit in Petrie’s allegation that the trial court committed plain error by allowing Dodd’s DNA-matching testimony that was not accompanied by population-frequency-statistical evidence. Petrie has not established that any error in the admission of Dodd’s testimony adversely affected the *222 outcome of the trial. Contrary to Petrie’s specific allegation, in light of all the evidence that was presented at trial, the jury was not misled. The defense expert’s report contained population-frequency-statistical evidence concerning the DNA evidence from the Lim crime scene that “matched” Petrie’s DNA profile. The population-frequency-statistical evidence in that report was not favorable to Petrie because it showed that the frequency of occurrence of the DNA profile that matched Petrie is rare. It is entirely possible that Petrie’s defense counsel decided not to object to Dodd’s lack of population-frequency-statistical testimony because such testimony would have been unfavorable to Petrie’s case. Petrie cannot use that reasonable decision by his trial counsel to now have his conviction reversed on appeal based on plain error. In any event, the defense expert’s report that was jointly presented by the State and the defense at trial contained matching DNA evidence and population-frequency-statistical DNA evidence. That evidence linked Petrie to the Lim crime scene. Thus, Dodd’s testimony linking Petrie to the crime scene was cumulative. Petrie has failed to establish that the admission of Dodd’s testimony probably affected his substantial rights. Therefore, Petrie has failed to establish that the trial court committed plain error.
Concerning the O’Rourke crime scene, Kristen Boster, a former forensic scientist for the Illinois State Police, testified that she analyzed some items related to that crime scene in 1994. Boster testified that she received eight items to analyze. Those items included four stains from items that were recovered from the crime scene and four blood standards from known individuals. The four blood standards were from James Green, Debra O’Rourke, Dennis O’Rourke, and Petrie. The four stains included two semen stains from a bedsheet, a blood and semen stain from a washcloth, and a semen stain from a pillowcase. Boster testified that she compared the DNA profiles of the four individuals to the DNA profiles of the stains. Based on those comparisons, Boster concluded that the DNA profile of the two stains on the bedsheet “matched James Green and could not have originated from any of the other individuals in the case.” (R. 1474.) Boster further concluded that the DNA profile of the stain from the washcloth “matched that of Steven Pe-trie and could not have originated from anybody else.” (R. 1474.) Boster also testified that the stain from the pillowcase “matched Steven Petrie and could not have originated from anyone else.” (R. 1474-75.) Boster’s testimony was not accompanied by any population-frequency-statistical evidence. Petrie did not object to the lack of population-frequency-statistical evidence.
Petrie appears to believe that DNA-matching evidence is irrelevant unless it is accompanied by population-fre-queney-statistical evidence. See (Petrie’s brief, at 86) (stating that “[t]estimony that a DNA profile ‘matched’ means nothing unless the statistical significance of the match is established”). We disagree, and Petrie does not cite any Alabama case holding that DNA-matching evidence is always inadmissible unless accompanied by population-frequency-statistical evidence. In fact, the Alabama Supreme Court has stated that “before admitting only one type of evidence (i.e., matching evidence or population frequency statistical evidence), the trial court must determine whether the probative value of admitting one type without the other type will outweigh the prejudicial impact the evidence may have on the jury.” Turner, 746 So.2d at 362 n. 10. Thus, matching evidence can be admitted without population-frequency-statistical evidence so long as the probative value of *223 the matching evidence is not outweighed by unfair prejudice. Even without accompanying population-frequency-statistical evidence, a DNA match has relevance because it shows the suspect could have contributed the sample to the crime scene.
In the offense involving O’Rourke, Pe-trie was a person of interest before Boster tested the DNA. Boster was only asked to compare the DNA profiles of the blood standards from known individuals to the DNA profiles of the stains. Boster concluded that the DNA profile of the stain from the washcloth and the stain from the pillowcase matched Petrie’s DNA profile and could not have originated from any of the other three individuals. Therefore, contrary to Petrie’s allegation, this matching evidence was relevant even without accompanying population-frequency-statistical evidence. This Court sees nothing misleading about Boster’s testimony and, thus, Petrie was not unfairly prejudiced by the admission of her testimony. Because Petrie has failed to establish that his substantial rights were adversely affected, we find that the trial court did not commit plain error.
VII.
Next, Petrie contends that the prosecution engaged in misconduct during its guilt-phase closing argument. Specifically, Petrie alleges that the prosecutor improperly “argued facts not in evidence” and “improperly asked the jury to convict Pe-trie to give justice to the victim of a crime for which Petrie was not on trial.” (Petric’s brief, at 90, 94.)
In Ferguson v. State, 814 So.2d 925 (Ala.Crim.App.2000), this Court held:
“This court has stated that ‘[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.’ Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). See also Henderson v. State, 583 So.2d 276, 304 (Ala.Crim.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). ‘In judging a prosecutor’s closing argument, the standard is whether the argument “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’ Bankhead, 585 So.2d at 107, quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). ‘A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.’ Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 528 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, ‘statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.’ Bankhead, 585 So.2d at 106. ‘Questions of the propriety of argument of counsel are largely within the trial court’s discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument.’ Bankhead, 585 So.2d at 105. We will not *224 reverse the judgment of the trial court unless there has been an abuse of that discretion. Id.”
814 So.2d at 945-46.
A.
Petrie alleges that during the State’s guilt-phase rebuttal closing argument, the State improperly argued facts not in evidence when the prosecutor stated:
“They want to make a big deal about Tina [Hillock]. And we talked about in jury selection about domestic violence victims. We talked about post-traumatic disorder. Tina did what she had to do to survive.”
(R. 1808.) That statement was in response to the defense’s argument that Hillock was not a credible witness because at a hearing in 1994 she testified that the violent incident involving her and Petrie never happened. On appeal, Petrie specifically argues that the prosecutor’s statement was improper because there was no evidence indicating that Hillock suffered from post-traumatic-stress disorder (“PTSD”) or Battered Woman Syndrome (“BWS”). (Petrie’s brief, at 91.)
Petrie did not object to the prosecutor’s statement; thus, he must establish that the trial court committed plain error in permitting the statement. See Rule 45A, Ala. R.App. P.; Wilson, supra. Furthermore, “ ‘[t]his court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’ ” Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990) (quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985)).
In his brief, Petrie correctly states that there was no evidence presented at trial indicating that Hillock received a medical diagnosis of PTSD or BWS. (Pe-trie’s brief, at 91-92.) However, the prosecutor never stated that Hillock had been diagnosed with either of those medical conditions. In fact, the prosecutor did not even mention BWS. There was ample evidence presented at trial indicating that Hillock suffered domestic violence at the hands of Petrie. Hillock testified that, after Petrie entered her apartment without her permission, he grabbed her and threw her onto the couch twice and put his hands around her throat to choke her. Hillock also testified that she was afraid of Petrie and that she was afraid that Petrie would harm her. Thus, based on that evidence, it was not improper for the prosecutor to implicitly argue that Hillock was a victim of domestic violence and was traumatized by the domestic violence. See Madison v. State, 718 So.2d 90, 99 (Ala.Crim.App.1997) (stating that “the rules governing a counsel’s inferences from the evidence are to be liberally construed, and that control of closing argument rests in the broad discretion of the trial court”). Viewing the prosecutor’s statement in the context of all the evidence presented and in the context of the complete closing arguments to the jury, we find that the gist of the prosecutor’s statement was that Hillock lied during her 1994 testimony because she was afraid of Petrie, and, thus, she “did what she had to do to survive.” That inference was permissible from the evidence. We cannot say that the prosecutor’s statement “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” Therefore, we conclude that the trial court did not abuse its discretion in permitting the prosecutor’s statement. Accordingly, the trial court did not commit any error, much less plain error.
Petrie also briefly argues on appeal that the prosecutor argued facts not in evidence when the prosecutor stat *225 ed: “We have the defendant with a knife, threatening Toni [Lim] with it.” (R. 1736-37.) Immediately after the prosecutor made that statement during closing argument, defense counsel objected to the statement, and the trial court sustained the objection. (R. 1737.) Defense counsel did not seek a curative instruction or a mistrial. On appeal, Petrie does not explain how this statement by the prosecutor “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” Regardless, the general rule is that a prejudicial statement is eradicated when the trial court sustains an objection to the statement. Walker, 932 So.2d at 153. In the present situation, that general rule is applicable; thus, the trial court’s action cured any potential prejudice. Therefore, no error occurred.
B.
Next, Petrie alleges that “the prosecution improperly asked the jury to convict Petrie to give justice to the victim of a crime for which Petrie was not on trial.” To support his allegation, Petrie points to two statements made by the prosecution during its closing argument.
First, during the initial portion of the closing argument, referring to pictures of Lim and O’Rourke, the prosecutor stated:
“Pictures like this (indicating). I’m sorry, but you had to see them.. You had to see these. You had to see what this crime was. You had to see the blood, the injuries. You had to hear about all our victims and what happened to them.”
(R. 1732-33) (emphasis added). Petrie did not object to that statement; thus, he must establish that the trial court committed plain error in permitting the statement. See Rule 45A, Ala. R.App. P.; Wilson, supra.
Second, during the rebuttal portion of the State’s closing argument, the prosecutor stated:
“[The defense] want[s] to talk about the not guilty verdict in Illinois. If you will recall, there were two charges in that case: That he robbed and murdered Debbie O’Rourke. And the jury found him guilty of the robbery. That was a guilty verdict. There was one thing that the jury in Illinois didn’t have the benefit of knowing that we know. They didn’t know what he had done to [Lim] in 1990.”
(R. 1807.) Immediately after the prosecutor made that statement, defense counsel objected. Id. Then, after holding a bench conference outside the hearing of the jury, the trial court sustained defense counsel’s objection. Id. Defense counsel did not seek a curative instruction or a mistrial.
On appeal, Petrie alleges that the first statement improperly refers to “our victims” because, Petrie says, “there was only one victim in the case in which Petrie was being tried: Toni Lim.” (Petrie’s brief, at 94.) Petrie further alleges that, viewing both statements together, the prosecutor was improperly asking the jury to punish Petrie for O’Rourke’s death because “he got away with it” in Illinois. (Petrie’s brief, at 95.) ,
Initially, we find that there is nothing improper about the prosecutor’s first statement. O’Rourke was a victim of a violent crime, and evidence concerning that crime was presented at trial. Viewing the statement in the context of all the evidence presented and in the context of the complete closing arguments to the jury, we cannot say that the prosecutor’s mere use of the phrase “our victims” so infected the trial with unfairness as to make the resulting conviction a denial of due process. Therefore, the trial court did not abuse its discretion by permitting the *226 prosecutor to use the phrase “our victims,” and, thus, the trial court did not commit error, much less plain error.
Concerning the prosecutor’s second statement, immediately after the prosecutor made that statement, defense counsel objected and the trial court sustained the objection. Defense counsel did not seek a curative instruction or a mistrial. As noted earlier, the general rule is that a prejudicial statement is eradicated by the trial court when it sustains an objection to the statement. Walker, 932 So.2d at 153. Petrie does not attempt to explain why that rule would not apply here, and we see no reason why the rule would not apply. Therefore, the trial court’s action cured any potential prejudice; thus, no error occurred.
C.
Petrie also alleges that the cumulative effect of the alleged prosecutorial misconduct warrants reversal of his conviction. See Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (stating that “while, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors had ‘probably injuriously affected substantial rights of the parties,’ then the cumulative effect of the errors may require reversal”). However, “when no one instance amounts to error at all (as distinguished from error not sufficiently prejudicial to be reversible), the cumulative effect cannot warrant reversal.” Id. This Court has considered each of the claims of prosecuto-rial misconduct and has found that no error occurred; thus, the cumulative effect cannot warrant reversal. Accordingly, this allegation is without merit.
VIII.
Next, Petrie argues that the trial court erroneously denied his motion for a judgment of acquittal because, he says, the evidence was insufficient to support his conviction for capital murder. Specifically, Petrie contends that the State did not present sufficient evidence that the murder was committed during a first-degree rape because, Petrie says, the State failed to present sufficient evidence of “forcible compulsion.”
“In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the state’s evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980). The trial court’s denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the appellant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978). In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983); Thomas v. State. When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal by the trial court does not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969); Willis v. State.”
Breckenridge v. State, 628 So.2d 1012,1018 (Ala.Crim.App.1993). “With respect to the *227 weight of the evidence, it is well-settled that any ‘inconsistencies and contradictions in the State’s evidence, as well as [any] conflict between the State’s evidence and that offered by the appellant, [go] to the weight of the evidence and [create a question] of fact to be resolved by the jury.’ ” Williams v. State, 10 So.3d 1083, 1087 (Ala.Crim.App.2008) (quoting Rowell v. State, 647 So.2d 67, 69-70 (Ala.Crim.App.1994)).
Section 13A-6-61(a)(1), Ala.Code 1975, provides that a person commits first-degree rape if “he or she engages in sexual intercourse with a member of the opposite sex by forcible compulsion.” Section 13A-6-60(8), Ala.Code 1975, defines “forcible compulsion” as “physical force that overcomes earnest resistance or a threat, express or implied, that places a person in fear of immediate death or serious physical injury to himself or another person.”
The Alabama Supreme Court has stated that “ ‘[t]he “totality of the circumstances” should be considered in deciding whether there was sufficient evidence of forcible compulsion.’” Ex parte Williford, 931 So.2d 10, 13 (Ala.2005) (quoting Parrish v. State, 494 So.2d 705, 713 (Ala.Crim.App.1985)).
In Bradley v. State, 494 So.2d 750 (Ala.Crim.App.1985), this Court held:
“Although an autopsy revealed no ‘evidence of trauma in genitalia area,’ the evidence was also sufficient to show that the element of forcible compulsion was present in both the rape, § 13A-6-61, and the sodomy, § 13A-6-63. [The victim] had been strangled. She was four feet, ten and three-eighths inches tall and weighed seventy-seven pounds. She had seven wounds or bruises on her neck. Again, the totality of all the circumstances provides ample evidence to support a finding of forcible compulsion. ...”
494 So.2d at 769-70.
In Turner v. State, 924 So.2d 737 (Ala.Crim.App.2002), this Court held that
“whether the victim was forcibly compelled to have intercourse was a question for the jury to resolve. Here, the condition of the scene of the crime and the condition of the body would lead a reasonable person to believe that [the victim] had been raped. [The victim’s] nude body was found on a bed in her home — in a room that was not her bedroom. [The victim] had been gagged and tied up. Forensic tests revealed the presence of semen in her vagina. A knife was lying on a bedside table and a telephone cord was under her body. The victim had defense-type wounds on her hands. Blood discovered at the scene of the murder matched the victim’s. Also, DNA tests conducted on the semen excluded [the victim’s] boyfriend and the other codefendants as the source of the semen. The condition of the body showed that the victim was not a willing participant to the events that ultimately led to her death. There was ‘sufficient evidence to permit the question of “forcible compulsion” to be submitted to the jury.’ Parks v. State, 565 So.2d 1265, 1269 (Ala.Crim.App.1990).”
924 So.2d at 779.
In the present situation, like the situations in Bradley and Turner, whether Pe-trie engaged in sexual • intercourse with Lim by forcible compulsion was a question to be resolved by the jury. The condition of the crime scene and the condition of Lim’s body could lead a reasonable person to believe that Lim had been raped. Like the situation in Bradley, although the autopsy of Lim’s body did not reveal any appreciable evidence of trauma to her genitalia, there was sufficient evidence to *228 prove the element of forcible compulsion. See also Williams v. State, 795 So.2d 753, 773 (Ala.Crim.App.1999) (stating that “[i]t is not necessary to show an injury to prove that a rape or an attempted rape occurred”). Lim suffered a stab wound to her neck and a large cut across her throat, which is prima facie evidence that the perpetrator attacked Lim with a weapon. Lim was dressed in only a blouse and a brassiere. A T-shirt was tied around Lim’s neck, and the shirt was soaked with blood. Lim’s hands were tied behind her back, and her wrist and ankles were bound with an exercise rope in a way that caused the rope to tighten if her legs were straightened. Lim had abrasions and bruising on certain areas of her skin. Semen was discovered in Lim’s vagina and anus. Therefore, we find that the totality of all the circumstances provided sufficient evidence to permit the question of “forcible compulsion” to be submitted to the jury. Any conflict between the State’s evidence and that offered by Petrie, went to the weight of the evidence, not the sufficiency of the evidence', and created a question of fact to be resolved by the jury.
IX.
Next, Petrie argues that the trial court’s refusal to conduct an in camera inspection of the grand-jury testimony unless he made a threshold showing of particularized need violated his constitutional rights. Petrie does not argue that the trial court erred under the prior decisions of this Court or the Alabama Supreme Court. Instead, Petrie asks this Court to “revisit the impossible, unconstitutional threshold showing outlined in its caselaw and remand the case to the trial court for a hearing to determine whether the grand jury transcript in the case contained exculpatory or inconsistent testimony.” (Pe-trie’s brief, at 105.) Petrie does not allege that any particular grand-jury testimony was exculpatory or inconsistent with the testimony presented at trial.
In Sneed v. State, 1 So.3d 104 (Ala.Crim.App.2007), this Court stated:
“Before an accused may discover grand jury testimony he must establish a particularized need for the information. In Blackmon v. State, 7 So.3d 397, 409-10 (Ala.Crim.App.2005), we stated:
“ ‘Alabama has long protected the secrecy of grand-jury proceedings. See § 12-16-214, Ala.Code 1975. “The long time rule, sanctioned by our courts, is that the proceedings before a grand jury are essentially secret.” Steward v. State, 55 Ala.App. 238, 240, 314 So.2d 313, 315 (Ala.Crim.App.1975). However, a defendant may be allowed to inspect grand-jury proceedings if the defendant meets the threshold test of showing a “particularized need” for breaching the secrecy of those proceedings. As ; this Court stated in Millican v. State, 423 So.2d 268 (Ala.Crim.App.1982):
“ ‘ “Before a defendant is allowed to inspect a transcript of a State’s witness who testified before the grand jury or before a trial judge should conduct an in camera inspection of such testimony, see Palermo [v. United States, 360 U.S. 343 (1959),] and Pate [v. State, 415 So.2d 1140 (Ala.1981) ], the defendant should at least and at a very minimum make some offer of proof (1) that the matters contained in the witness’ grand jury testimony were relevant to the subject matter of the prosecution; (2) and that there exists an inconsistency between grand jury testimony and trial testimony. Unless defense counsel is merely going on a fishing expedition, he will have some information as to the *229 particular inconsistency in the defendant’s testimony. In this case no such showing was made and the existence of any inconsistency between the witness’ trial and grand jury testimony was never even alleged. Cooks [v. State, 50 Ala.App. 49, 276 So.2d 684 (Ala.Crim.App.1973) ]. Also, there was no showing that the witness’ grand jury testimony, if available, was ‘of such nature that without it the defendant’s trial would be fundamentally unfair.’ Cooks, 50 Ala.App. at 54, 276 So.2d 634. See also Husch v. State, 211 Ala. 274, 276,100 So. 321 (1924). (‘Moreover, if the solicitor had had such a statement in his possession, defendant could have required its production by a rule of the court if he thought it was favorable to him.’).
“ ‘ “In laying the proper predicate for examination of a witness’ grand jury testimony, it should also be established that the witness testified before the grand jury and that such testimony was recorded or reduced to writing, unless a grand juror will be called to disclose the testimony of the witness. Alabama Code 1975, Section 12-16-201.
“ ‘ “ ‘When the defendant, in effect, asks for the State District Attorney to produce a document, he should at least establish that this State official has such document or a copy thereof in his possession before the trial court will be put in error.’ Strange v. State, 43 Ala.App. 599, 606, 197 So.2d 437 [ (1966) ], cert. dismissed, 280 Ala. 718,197 So.2d 447 (196[7]).
“ ‘ “Once the defendant has laid a proper predicate for the impeachment of a witness who testified before the grand jury, the trial judge should conduct an in camera inspection as outlined in Palermo, supra, and Pate, supra, to determine (1) whether the statement made by the witness before the grand jury ‘differed in any respects from statements made to the jury during trial,’ Pate, supra, and (2) whether the grand jury testimony requested by the defendant “was of such a nature that without it the defendant’s trial would be fundamentally unfair.’ Pate, supra. This procedure will best preserve and protect the legislative determination that ‘it is essential to the fair and impartial administration of justice that all grand jury proceedings be secret and that the secrecy of such proceedings, remain inviolate.’ Alabama Code 1975, Sections 12-16-214 through 226.’ ”
“ ‘423 So.2d at 270-71.
“‘Nonetheless, Alabama has no statute that requires that grand-jury proceedings be recorded or otherwise memorialized. In Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001), the defendant argued that the circuit court erred in denying her motion to transcript the grand-jury testimony. In upholding the circuit court’s ruling, we stated:
“ ‘ “ ‘In Alabama there is no statute requiring that testimony before a grand jury be recorded. “A Grand Jury is not required to compile records and the testimony in the absence of a statute requiring preservation of the proceedings. State ex rel. Baxley v. Strawbridge, 52 Ala.App. 685, 296 So.2d 779 [ (Ala.Crim.App.1974) ]. There is no such statute in this state.” Sommerville v. State, 361 So.2d 386, 388 *230 (Ala.Cr.App.), cert. denied, 361 So.2d 389 (Ala.1978), cert. denied, 439 U.S. 1118, 99 S.Ct. 1027, 59 L.Ed.2d 78 (1979). See also Gaines v. State, 52 Ala.App. 29, 30, 288 So.2d 810, 812, cert. denied, 292 Ala. 720, 288 So.2d 813 (1973), cert. denied, 419 U.S. 851, 95 S.Ct. 92, 42 L.Ed.2d 82 (1974). Because there was no legal requirement that the grand jury proceedings be recorded, this contention is without merit.’ ”
“ ‘Stallworth, 868 So.2d at 1139, quoting Hardy v. State, 804 So.2d 247, 287 (Ala.Crim.App.1999), aff'd, 804 So.2d 298 (Ala.2000). See also Steward v. State, supra.
“ ‘At the pretrial hearing on this motion, the prosecutor stated that it was the policy of the district attorney’s office to not record the grand-jury proceedings and that he had no knowledge that the grand-jury proceedings had been recorded in this case. Neither did Blackmon show a “particularized need” to breach the secrecy of the grand-jury proceedings. Based on the cases cited above, we conclude that the circuit court committed no error in denying this motion made after Blackmon had been indicted.’ ”
1 So.3d at 133-35.
In Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996), a capital-murder defendant made a broad claim that his constitutional and due-process rights were violated by the denial of his discovery request for the testimony of the grand jury, but he did not give any specific reasons for his request for the grand-jury testimony. In that situation, this Court held that because the defendant failed to make a preliminary showing that would justify abrogation of the secrecy of grand-jury proceedings, the defendant’s request for discovery of the grand-jury testimony was properly denied and his claim was without merit. Arthur, 711 So.2d at 1078-79.
Likewise, in the present case, we conclude that there is no merit to Petrie’s broad claim that his constitutional rights were violated when the trial court required him to make a threshold showing of particularized need before the court would conduct an in camera inspection of the grand-jury testimony. The trial court’s refusal to allow the defendant merely to go on a fishing expedition is not unconstitutional. We see no reason to revisit our prior holdings requiring that a defendant meet the threshold test of showing a particularized need for breaching the secrecy of the grand-jury proceedings. Therefore, Petrie is not entitled to any relief on this claim.
X.
Next, Petrie argues that the trial court erroneously admitted 72 photographs depicting the Lim and O’Rourke crime scenes and Lim’s and O’Rourke’s bodies during their autopsies. Petrie further argues that the trial court erroneously admitted a videotape depicting the O’Rourke crime scene. Specifically, Petrie contends that the photographs and the videotape were inadmissible because, he says, they were cumulative, gruesome, and inflammatory.
In Stanley v. State, 143 So.3d 230 (Ala.Crim.App.2011), this Court stated:
“Alabama courts have recognized that photographs depicting the crime scene and the wounds of the victims are relevant and admissible. See Stallworth v. State, 868 So.2d at 1151 (quoting Land v. State, 678 So.2d 201, 207 (Ala.Crim.App.1995)) (“‘The courts of this state have repeatedly held that photographs that accurately depict the crime scene and the nature of the victim’s wounds *231 are admissible despite the fact that they may be gruesome or cumulative.” ’). See also Miller v. State, 63 So.3d 676, 704 (Ala.Crim.App.2010) (applying law on autopsy photographs to crime-scene photographs); Vanpelt [v. State ], 74 So.3d [32,] 80 [ (Ala.Crim.App.2009) ] (same); Hyde [v. State ], 13 So.3d [997,] 1016 [ (Ala.Crim.App.2007) ] (same).
“ ‘ ‘‘Generally photographs are admissible into evidence in a criminal prosecution ‘if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.’ ” Bankhead v. State, 585 So.2d 97, 109 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d, 625 So.2d 1146 (Ala.1993), quoting Magwood v. State, 494 So.2d 124, 141 (Ala.Crim.App.1985), aff'd, 494 So.2d 154 (Ala.1986), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). “Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome.” Williams v. State, 506 So.2d 368, 371 (Ala.Crim.App.1986) (citations omitted). In addition, “photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.” Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989). “This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim’s injuries.” Ferguson v. State, 814 So.2d 925, 944 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). ‘“[A]utopsy photographs depicting the character and location of wounds on a victim’s body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter.’” Jackson v. State, 791 So.2d 979, 1016 (Ala.Crim.App.2000), quoting Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), judgment vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), on remand to, 851 So.2d 453 (Ala.2002).’
“Brooks v. State, 973 So.2d 380, 393 (Ala.Crim.App.2007).
“All the photographs about which [the defendant] complains were introduced into evidence in the guilt phase of the trial during the testimony of the investigating officer, who was also the coroner, and the testimony of Dr. Ward, the medical examiner. Each photograph was identified by the respective witness. In addition, the medical examiner detailed the injuries depicted in the photographs and explained to the jury the significance of the injuries. We have carefully examined the photographs, as well the testimony of the witnesses, and we conclude that the photographs were relevant, probative, and properly admitted into evidence.”
143 So.3d at 271.
Furthermore,
“‘The same rule applies for videotapes as for photographs: “The fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury.” ’ Siebert v. State, 562 So.2d 586, 599 (Ala.Crim.App.1989), aff'd, 562 So.2d 600 (Ala.1990), quoting Walker v. State, 416 So.2d 1083, 1090 (Ala.Crim.App.1982). See also Ward v. State, 814 So.2d 899 (Ala.Crim.App.2000). Generally, ‘[a] properly authenticated video tape recording of the scene *232 of the crime constitutes competent evidence’ and ‘is admissible over the defendant’s objections that the tape was inflammatory, prejudicial, and cumulative.’ Kuenzel v. State, 577 So.2d 474, 512-13 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991). ‘Provided that a proper foundation is laid, the admissibility of videotape evidence in a criminal trial is a matter within the sound discretion of the trial judge.’ Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Crim.App.1986).”
Brooks v. State, 973 So.2d 380, 393 (Ala.Crim.App.2007).
In the present case, there was no error in admitting the photographs and the videotape into evidence. The videotape and all the photographs about which Petrie complains were identified at trial by either law-enforcement officers who investigated the Lim and O’Rourke crimes, the forensic pathologist who performed the autopsy on Lim’s body, or the Illinois medical examiner who performed the autopsy on O’Rourke’s body. (R. 977, 1008, 1079, 1375, 1379-81, 1454.) The burden was on the State to prove the cause of Lim’s death and the identity of her killer. This evidence depicting the crime scenes and the nature of Lim’s and O’Rourke’s wounds was relevant to the State’s case; thus, this evidence was admissible at trial even if this evidence was gruesome, cumulative, or had a tendency to inflame the minds of the jurors. Therefore, the trial court did not abuse its discretion in allowing the photographs and the videotape to be received into evidence.
Penalty-Phase Issues XI.
Next, Petrie argues that the trial court violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by prohibiting him from presenting argument concerning “residual doubt” or “lingering doubt” during the penalty phase of the trial.
In the course of the defense counsel’s closing argument during the penalty phase of the trial, the following occurred:
“[Defense counsel]: Now, you have a choice. You have a choice on whether or not this defendant — the State is asking you to put him to death. But you have a choice. And there’s things that you should consider, too. And, again, I want you to understand that I do respect your decision. But I think you need to start with — I respect your decision of guilty. But you need to start with, was there any evidence of the guilt of the crime that was established with so much sufficiency or certainty to warrant death or do you harbor any doubts? That’s where you start. Do you harbor any doubts at all?
“[Prosecutor]: Objection, Your Honor.
“The Court: Sustained. They have reached a verdict. Now, let’s move on.”
(R.1960.) There was no argument regarding this objection. After the trial court’s ruling, defense counsel simply continued with his closing argument.
In Ex parte Lewis, 24 So.3d 540, 543 (Ala.2009), the Alabama Supreme Court recognized that defendants do not have a constitutional right to present residual doubt as a mitigating factor during the penalty phase of a capital-murder trial. Furthermore, our Supreme Court explained:
“Section 13A-5-51, Ala.Code 1975, without limiting possible mitigating circumstances, statutorily defines a number of mitigating circumstances. Residual doubt as to the defendant’s guilt is not a statutory mitigating circumstance. Instead, as the State argues, ‘all seven statutory mitigating circumstances [in § 13A-5-51] relate to the defendant or *233 the circumstances of the crime for which the defendant [has been found guilty] and merely reduce the defendant’s culpability for committing that crime.’ State’s brief, at 29.
“Section 13A-5-52, Ala.Code 1975, allows a capital defendant to offer mitigating circumstances in addition to those enumerated in § 13A-5-51. Specifically, it provides:
“ ‘In addition to the mitigating circumstances specified in Section 13A-5-51, mitigating circumstances shall include any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstances which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.’
“It is inarguable, as the Court of Criminal Appeals has pointed out on many occasions, that residual doubt is not a factor about the ‘defendant’s character or record [or] any of the circumstances of the offense.’ See, e.g., Melson v. State, 775 So.2d 857, 899 (Ala.Crim.App.1999), aff'd, 775 So.2d 904 (Ala.2000). Indeed, as the State argues, residual doubt ‘is nothing more than a juror’s state of mind and bears directly on the defendant’s guilt, [and] is no.t a fact or situation relating to the defendant’s character or record or which reduces the defendant’s culpability in the commission of a crime for which guilt is a foregone conclusion.’ State’s brief, at 25.
“According to [the defendant], the language of § 13A-5-52 providing that ‘mitigating circumstances shall include ... any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death’ is broad enough to allow the consideration of residual doubt at the penalty phase of a capital-murder , trial. It is not, however, because residual doubt is not a ‘relevant mitigating circumstance.’
“A mitigating circumstance is ‘[a] fact or situation that does not bear on the question of a defendant’s guilt but is considered ... in imposing punishment and esp. in lessening the severity of a sentence.’ Black’s Law Dictionary 260 (8th ed.2004). As previously stated in this opinion, residual doubt bears directly on the question of a defendant’s guilt. In fact, [the defendant] admits as much: ‘Residual doubt arises because even though the evidence the juror saw was enough to convict, there is a possibility that ... the defendant is really innocent.’ [The defendant’s] reply brief, at 13. Also, residual doubt is not a ‘fact or situation.’ Instead, it is merely ‘a lingering uncertainty about facts, a state of mind that exists somewhere between “beyond a reasonable doubt” and “absolute certainty.” ’ Franklin v. Lynaugh, 487 U.S. 164, 188, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (O’Connor, J., concurring). Stated simply, [the defendant’s] arguments find no support in Alabama’s statutory provisions addressing mitigating circumstances.
“Residual doubt is not a mitigating circumstance. Consequently, the Court of Criminal Appeals was correct in holding that the trial court did not err in denying [the defendant’s] requested jury charge on residual doubt during the penalty phase of [the defendant’s] capital-murder trial.”
Lewis, 24 So.3d at 543-44.
Similarly, in Melson v. State, 775 So.2d 857 (Ala.Crim.App.1999), this Court stated:
*234 “ ‘ “[Cjapital defendants have no right to demand jury consideration of ‘residual doubts’ in the sentencing phase. Franklin v. Lynaugh, 487 U.S. 164,172-76, 108 S.Ct. 2320, 2326-28, 101 L.Ed.2d 155 (1988).” ’ Rieber [v. State ], 663 So.2d [985] at 995 [ (Ala.Cr.App.1994) ], quoting Carroll v. State, 599 So.2d 1253, 1271 (1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207,127 L.Ed.2d 554 (1994).
“In Myers v. State, 699 So.2d 1281 (Ala.Cr.App.1996), aff'd, 699 So.2d 1285 (Ala.1997), cert. denied, 522 U.S. 1054, 118 S.Ct. 706, 139 L.Ed.2d 648 (1998), this court stated the following concerning jury instructions on ‘residual doubt’:
“ ‘ “ ‘Our cases do not support the proposition that a defendant who has been found to be guilty of a capital crime beyond a reasonable doubt has a constitutional right to reconsideration by the sentencing body of lingering doubts about his guilt. We have recognized that some states have adopted capital sentencing procedures that permit defendants in some cases to enjoy the benefit of doubts that linger from the guilt phase of the trial, see Lockhart v. McCree, 476 U.S. 162, 181, 106 S.Ct. 1758, 1768, 90 L.Ed.2d 137 (1986), but we have never indicated that the Eighth Amendment requires states to adopt such procedures. To the contrary, as the plurality points out, we have approved capital sentencing procedures that preclude consideration by the sentencing body of “residual doubts” about guilt. See Ante, [487 U.S. at 173 n. 6, 108 S.Ct.] at 2327, n. 6.
“ ‘ “ ‘Our decisions mandating jury consideration of mitigating circumstances provide no support for petitioner’s claim because “residual doubt” about guilt is not a mitigating circumstance. We have defined mitigating circumstances as facts about the defendant’s character or background, or the circumstances of the particular offense, that may call for a penalty less than death, [citations omitted]. “Residual doubt” is not a factor about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between “beyond a reasonable doubt” and “absolute certainty.” ’ ” ’
“699 So.2d at 1283-84, quoting Harris v. State, 632 So.2d 503, 535 (Ala.Cr.App.1992), aff'd, 513 U.S. 504,115 S.Ct. 1031, 130 L.Ed.2d 1004 (D.Ala.1995), quoting in turn Franklin v. Lynaugh, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).”
775 So.2d at 898-99.
In the context of sentencing for a capital-murder conviction, the United States Supreme Court has adopted the following rule:
“ ‘[T]he Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.’ ”
Oregon v. Guzek, 546 U.S. 517, 524, 126 S.Ct. 1226, 163 L.Ed.2d 1112 (2006) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)) (emphasis deleted). As noted earlier, in Lewis, our Supreme Court stated that “[i]t is inarguable ... that residual doubt is not a factor about the ‘defendant’s character or record [or] any of the circumstances of the offense.’ See, e.g., Melson v. State, 775 So.2d 857, 899 (Ala.Crim.App.1999).” Lewis, 24 So.3d at 543. Therefore, under the rule set forth by the United States *235 Supreme Court, our Supreme Court has recognized that the sentencer may be precluded from considering residual doubt without violating the Eighth and Fourteenth Amendments. Thus, Petrie’s argument to the contrary is without merit.
Concerning the Sixth Amendment, Pe-trie argues that he was denied his right to effective counsel under the Sixth Amendment by the trial court’s ruling prohibiting him from arguing residual doubt. Specifically, Petrie contends that prohibiting him from presenting argument concerning residual doubt is inconsistent with decisions of the United States Court of Appeals for Eleventh Circuit that, in the context of deciding whether trial counsel performed effectively during the penalty phase of the trial, have noted that trial counsel’s use of “this lingering doubt or residual doubt theory is very effective in some cases.” Hannon v. Secretary for the Dep’t of Corr., 562 F.3d 1146, 1154 (11th Cir.2009). See Parker v. Secretary for the Dep’t of Corr., 331 F.3d 764, 787-88 (11th Cir.2003) (stating that “[c]reating lingering or residual doubt over a defendant’s guilt is not only a reasonable strategy, but ‘is perhaps the most effective strategy to employ at sentencing’ ”) (quoting Chandler v. United States, 218 F.3d 1305, 1320 n. 28 (11th Cir.2000)); see also Tarver v. Hopper, 169 F.3d 710, 715-16 (11th Cir.1999) (citing law-review study concluding that “the best thing a capital defendant can do to improve his chances of receiving a life sentence ... is to raise doubt about his guilt”).
Relying on cases like Chandler and Tar-ver, Petrie alleges that “it cannot be true that residual doubt is both legally effective as a defense strategy and impermissible as a defense strategy.” (Petrie’s brief, at 116.) However, Petrie’s allegation presents a false dichotomy. The fact that trial counsel may not be constitutionally ineffective for arguing residual doubt in some cases when he or she is allowed to make such an argument does not mean that the Constitution mandates that trial counsel be allowed to argue residual doubt. In fact, since Chandler and Tarver were decided, the Eleventh Circuit Court of Appeals has explicitly stated that “[t]he Constitution does not compel state courts to consider residual doubt.” Zeigler v. Crosby, 345 F.3d 1300, 1310 (11th Cir.2003) (citing Franklin v. Lynaugh, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)); see also Allen v. Secretary for the Florida Dep’t of Corr., 611 F.3d 740, 750 (11th Cir.2010) (stating that “there is no constitutional right to have residual doubt considered as mitigation”) (citing Oregon v. Guzek, 546 U.S. 517, 526-27, 126 S.Ct. 1226, 163 L.Ed.2d 1112 (2006)). Therefore, contrary to Petrie’s allegation, the trial court did not prohibit his trial counsel from performing effectively under the Sixth Amendment by prohibiting him from arguing residual doubt.
Based on prior decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals, the Alabama Supreme Court, and this Court, we conclude that neither the Sixth nor the Eighth nor the Fourteenth Amendment to the United States Constitution requires that the defendant be allowed to present argument concerning “residual doubt” during the penalty phase of the trial. Thus, Petrie’s claim is without merit.
XII.
Next, Petrie argues that the trial court’s receipt and consideration of the presentence report during sentencing violated his Sixth Amendment right to confront the witnesses against him.[3] Petrie *236 did not raise this argument before the trial court; thus, we will review this claim for plain error only. See Rule 45A, Ala. R.App. P.; Wilson, supra.
Section 13A-5-47(b), Ala.Code 1975, requires that a presentence report be prepared and considered before sentencing in a capital case, and the statute gives the parties the right to respond to the presen-tence report:
“Before making the sentence determination, the trial court shall order and receive a written pre-sentence investigation report. The report shall contain the information prescribed by law or court rule for felony cases generally and any additional information specified by the trial court. No part of the report shall be kept confidential, and the parties shall have the right to respond to it and to present evidence to the court about any part of the report which is the .subject of factual dispute. The report and any evidence submitted in connection with it shall be made part of the record in the case.”
This Court has held that sentencing a defendant to death without the benefit of a presentence report is plain error. Washington v. State, 106 So.2d 423, 433 (Ala.Crim.App.2007), rev’d on other grounds, Ex parte Washington, 106 So.3d 441 (Ala.2011).
Rule 26.3(b), Ala. R.Crim. P., provides that the presentence report shall contain:
“(1) A statement of the offense and the circumstances surrounding it;
“(2) A statement of the defendant’s prior criminal and juvenile record, if any;
“(3) A statement of the defendant’s educational background;
“(4) A statement of the defendant’s employment background, financial condition, and military record, if any;
“(5) A statement of the defendant’s social history, including family relationships, marital status, interests, and activities, residence history, and religious affiliations;
“(6) A statement of the defendant’s medical and psychological history, if available;
“(7) Victim Impact Statements; and
“(8) Any other information required by the court.”
In the present case, the trial court stated that it generally considered, among other things, the presentence report in reaching its decision to sentence Petrie to death. (C. 51.) More specifically, in the trial court’s findings concerning the statutory mitigating circumstances, the trial court found that the mitigating circumstance “the defendant has no significant history of prior criminal activity” did not apply because “the presentence investigation report prepared in this case indicates that the defendant has previously been convicted of ‘felony theft — auto’ (2 years’ confinement), theft (2 years’ confinement), armed robbery (26 years’ confinement), and illegally possessing a firearm as a convicted felon (30 months’ confinement).” (C. 49.)
The author of the presentence report was not called to testify at sentencing. On appeal, Petrie states that one sentence in the presentence report is inaccurate. That sentence appears in the section of the report titled “details of offense” and states that during a police interview, Petrie ad *237 mitted that “he ties women up during sex.” (C. 333.) During sentencing, Petrie objected to the accuracy of that statement, and the trial court noted on the report that Petrie “denies admitting that he ties up women during sex.” (R.2077-79; C. 333.) The State offered to “supplement the record with a videotaped statement by this defendant with that sentence, that statement, that admission in it.” (R.2079.) The trial court responded that “that’s up to whoever, however /all want to present this.” Id. The trial court then asked defense counsel whether there was “anything else from the defense on the presentence investigation report?” Id. Defense counsel replied that there was not anything else. Id. The trial court then gave the State and the defense the opportunity to present any testimony that they desired to present. (R.2079-80.)
On appeal, citing Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), Petrie argues that during capital sentencing, the Confrontation Clause of the Sixth Amendment applies to exclude all statements contained in a presentence report “unless the author of the [presentence report] as well as any informants were called to testify in court.” (Petrie’s brief, at 128.) The State responds that the Confrontation Clause and Crawford do not apply at sentencing and that, even if the Confrontation Clause and Crawford apply to sentencing in a capital ease, any error in the consideration of the report was harmless in the present case.
In Crawford, during trial, the State introduced a recorded statement that the defendant’s wife had made during police interrogation. The -wife did not testify at trial, invoking the marital privilege. The defendant argued that admitting the recorded statement would violate his Sixth Amendment right to be confronted with the witnesses against him. Based on Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the trial court admitted the statement, holding that the statement bore “adequate indicia of reliability” because it bore “particularized guarantees of trustworthiness.” 448 U.S. at 66. On appeal of the defendant’s conviction, the United States Supreme Court abrogated Roberts and held that where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is confrontation. The Court further held that under the Sixth Amendment’s Confrontation Clause, testimonial statements are not admissible, unless the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. Crawford, 541 U.S. at 53-54.
In Melendez-Diaz, during trial the prosecution introduced sworn-to certificates of state laboratory analysts. The certificates stated that a substance seized by the police and connected to the defendant was cocaine. The defendant objected to the admission of the certificates, asserting that Crawford required the analysts to testify in person. The trial court disagreed and admitted the certificates. On appeal of the defendant’s conviction, the United States Supreme Court held that the certificates were affidavits that fall within the core class of testimonial statements covered by the Confrontation Clause and that the analysts were “witnesses” for purposes of the Clause; thus, “[a]bsent a showing that the analysts were unavailable to testify at trial and that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to ‘ “be confronted with” ’ the analysts at trial.” Melendez-Diaz, 557 U.S. at 311 (citing Crawford, 541 U.S. at 54. The *238 Court also held that the defendant’s ability to subpoena the analysts did not obviate the State’s Confrontation Clause obligation to produce the analysts for cross-examination. The Court stated that “the Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court.” Melendez-Diaz, 557 U.S. at 324.
In the present case, it is undisputed that, as many United States Courts of Appeals have concluded, in noncapital cases Crawford did not alter preexisting law stating that the Sixth Amendment’s Confrontation Clause does not apply at sentencing. See, e.g., United States v. Chau, 426 F.3d 1318, 1323 (11th Cir.2005); United States v. Luciano, 414 F.3d 174, 179 (1st Cir.2005); United States v. Martinez, 413 F.3d 239, 243 (2d Cir.2005); United States v. Stone, 432 F.3d 651, 654 (6th Cir.2005); United States v. Roche, 415 F.3d 614, 618 (7th Cir.2005); United States v. Brown, 430 F.3d 942, 944 (8th Cir.2005); and United States v. Littlesun, 444 F.3d 1196, 1200 (9th Cir.2006). However, to support his contention that the Confrontation Clause and Crawford apply during sentencing in a capital case, Petrie relies on Proffitt v. Wainwright, 685 F.2d 1227 (11th Cir.1982), which was decided 22 years before Crawford and recognized a right to cross-examination in the context of sentencing in a capital case.[4]
In Proffitt, after the jury rendered its advisory sentence of death, the defendant was examined by two court-appointed psychiatrists. After the defendant was examined, both psychiatrists submitted reports to the trial court. Following the submission of the reports, the trial court held a hearing, at which one of the psychiatrists testified. However, the other psychiatrist was unable to attend the hearing, and defense counsel requested an opportunity to cross-examine him about his report. The trial court indicated that it would allow the psychiatrist’s testimony to be taken and made part of the record at a later date, but the court proceeded to sentence the defendant to death without the psychiatrist’s testimony. Proffitt, 685 F.2d at 1250.
On appeal from the denial of the defendant’s petition for habeas corpus, the Eleventh Circuit Court of Appeals declared that “[t]he view, once prevalent, that the procedural requirements applicable to capital sentencing are no more rigorous than those governing noncapital sentencing decisions, see, e.g., McGautha v. California, 402 U.S. [183,] 217, 91 S.Ct. [1454,] 1472 [ (1971) ]; Williams v. New York, 337 U.S. [241,] 251-52, 69 S.Ct. [1079,] 1085 [ (1949) ], is no longer valid. Gardner v. Florida, 430 U.S. [349,] 357-58, 97 S.Ct. [1197,] 1204 [ (1977) ].” Proffitt, 685 F.2d at 1253.
One of the decisions of the United States Supreme Court that was noted in Proffitt, Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), is very similar to the present case. In Williams, after considering a statutory presentence report, the trial court rejected the jury’s recommendation of life imprisonment and *239 sentenced the defendant to death. In deciding to sentence the defendant to death, the trial court relied on statements in the presentence report that “revealed many material facts concerning [the defendant’s] background which though relevant to the question of punishment could not properly have been brought to the attention of the jury in its consideration of the question of guilt.” Williams, 337 U.S. at 244. On appeal, the defendant argued that his constitutional due-process rights had been violated because, he said, “the sentence of death was based upon information supplied by witnesses with whom the accused had not been confronted and as to whom he had no opportunity for cross-examination or rebuttal.”[5] Id. at 243. The United States Supreme Court rejected the defendant’s confrontation argument and held that, at sentencing in even a capital case, the trial court is permitted to consider out-of-court information. Id. at 251-52.
Proffitt noted Williams, but relying on the decision of the United States Supreme Court in Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), and on the decision of the former Fifth Circuit Court of Appeals in Smith v. Estelle, 602 F.2d 694 (5th Cir.1979),[6] the Eleventh Circuit Court of Appeals declared that the view expressed in Williams “is no longer valid.” Proffitt, 685 F.2d at 1253. The Proffitt Court recognized that Gardner was not directly on point, but the Court explained:
“In Gardner v. Florida, supra, the Supreme Court held that a judge’s reliance, in imposing the death penalty, on information not disclosed to the defendant or his attorney violated the defendant’s rights to due process and freedom from cruel and unusual punishment. Gardner is premised on the principle that death sentences may not constitutionally be imposed on the basis of information that the capital defendant has been afforded no opportunity to rebut. See id. at 362, 97 S.Ct. at 1206. The holding in Gardner, narrowly viewed, simply prohibits the use of ‘secret information’; the Court did not in that case address the scope of the capital defendant’s procedural rights in attempting to rebut information that has openly been presented to the sentencing tribunal. In reaching its decision in Gardner, however, the Court emphasized the unacceptability of the ‘risk that some information accepted in confidence may be erroneous, or may be misinterpreted, by the ... sentencing judge.’ Id. at 359, 97 S.Ct. at 1205. Moreover, the Court expressly recognized the importance of participation by counsel and adversarial debate to eliciting the truth and ‘evaluating the relevance and significance of aggravating and mitigating’ evidence. Id. at 360, 97 S.Ct. at 1205. The Supreme Court’s emphasis in Gardner and other capital sentencing cases on the reliability of the factfinding underlying the decision whether to impose the death penalty convinces us that the right to eross- *240 examine adverse witnesses applies to capital sentencing hearings.”
Proffitt, 685 F.2d at 1253-54.
Furthermore, regarding Smith, the Court explained:
“Finally, we note that the decision of the former Fifth Circuit in Smith v. Estelle, 602 F.2d 694 (5th Cir.1979), aff'd, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), buttresses our conclusion that appellant had a constitutional right to cross-examine Dr. Sprehe before the doctor’s report could be used in determining sentence. In Smith, we reversed a death sentence that was based in part on the testimony of a psychiatrist whose name the prosecution had intentionally omitted from its witness list. A primary basis for the decision in that case was that the prosecution’s failure to disclose its intent to call the doctor prevented the defendant’s coungel from conducting effective cross-examination. See id. at 699-701 & n. 7. Although the court did not specifically address whether the defendant had a constitutional right to cross-examine the psychiatrist, it concluded that his testimony, ‘not effectively cross-examined by the (defense attorneys,) () carries no assurance of reliability whatever,’ id. at 701, and hence that its use in sentencing the defendant violated the principles set forth in Gardner v. Florida. The reasoning in Smith clearly supports the view that the right to cross-examine adverse witnesses applies to capital sentencing proceedings, at least where necessary to ensure the reliability of the witnesses’ testimony.”
Proffitt, 685 F.2d at 1254-55 (footnote omitted).
More recent decisions from the Courts of Appeals expressly disagree with Proffitt’s declaration. For example, in United States v. Fields, 483 F.3d 313 (5th Cir. 2007), the capital-murder defendant maintained that the trial court erred by admitting testimonial hearsay at sentencing in violation of Crawford. Relying on Williams, the Fifth Circuit Court of Appeals concluded that “the Confrontation Clause does not operate to bar the admission of testimony relevant only to a capital sentencing authority’s selection decision.” Fields, 483 F.3d at 326. The Court noted that Williams has never been overruled and that the United States Supreme Court “continues to cite Williams for the proposition that there are no per se constitutional prohibitions on the introduction of hearsay at sentencing.” Fields, 483 F.3d at 327-28 (citing United States v. Tucker, 404 U.S. 443, 446-47, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972); Witte v. United States, 515 U.S. 389, 397-98, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995); and Wisconsin v. Mitchell, 508 U.S. 476, 485, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993)). Concerning Gardner, the Court explained:
“Perhaps more importantly, Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), a post-incorporation decision regarding procedural requirements at capital sentencing, establishes that Williams remains relevant in the capital sentencing context. In Gardner, a plurality held that a defendant cannot be sentenced to death on the basis of information undisclosed to a defendant and contained in a presen-tence investigation report because, to satisfy due process, a capital defendant must be given a chance to rebut or explain adverse information introduced at sentencing. Id. at 362, 97 S.Ct. 1197. At first blush, this ruling appears to call the core holding of Williams into doubt. Any characterization of Gardner as a Williams-killer and a harbinger of the application of the confrontation right at *241 capital sentencing would be misplaced, however, for at least two reasons.
“First, Gardner, like Williams, is .a due process case. Asked to examine what rights defendants have under the Due Process Clause with regard to the presentation of evidence at capital sentencing, the Court noted that defendants were entitled to effective assistance of counsel during sentencing, id. at 358, 97 S.Ct. 1197, but made no mention of a right of confrontation, lending further credence to the notion that the categorization of Williams as a pre-incorpo-ration due process case does not vitiate its relevance to the issue with which we are faced.
“Second, Gardner explicitly declined to overrule Williams and instead distinguished it, stating that ‘the holding of Williams is not directly applicable to this case.’ Id. at 356, 97 S.Ct. 1197. ‘[I]n Williams the material facts concerning the defendant’s background which were contained in the presentence report were described in detail by the trial judge in open court,’ affording the defendant the opportunity ‘to challenge the accuracy or materiality’ of said facts. Id. The Gardner plurality held only that a defendant’s due process rights are abridged where he is given no similar ‘opportunity to deny or explain’ adverse evidence, id. at 362, 97 S.Ct. 1197, and the plurality was careful to note that ‘[t]he fact that due process applies [at capital sentencing proceedings] does not, of course, implicate the entire panoply of criminal trial procedural rights,’ id. at 358, 97 S.Ct. 1197 n. 9.
“The dissent notes that the Gardner plurality also distinguishes Williams on the ground that ‘[t]he trial judge in Williams was not asked to “ ‘afford appellant a chance to refute or discredit any of [the statements at issue] by cross-examination or otherwise.’ ” ’ Id. at 356, 97 S.Ct. 1197 (quoting Williams). As the Second Circuit has stated, however, Williams ‘does not turn on any concept of waiver by failure to object. It rests, rather, on the broad ground that due process does not preclude reliance on out-of-court information in imposing sentence.’ United States v. Fatico, 579 F.2d 707, 712 n. 11 (2d Cir.1978).
“More importantly, despite making note of the Williams defendant’s failure to object at sentencing to the denial of an opportunity to challenge the veracity of the relevant information through, inter alia, cross-examination, Gardner nowhere suggests that cross-examination of hearsay declarants in particular is necessary to satisfy due process. Gardner instead focuses solely on whether information has been disclosed to the defendant so that he can ‘deny or explain’ it by any means.
“Gardner offers no basis for assuming that cross-examination of a witness presenting hearsay evidence, for example, would not be sufficient to satisfy constitutional concerns, a fact that Professor John Douglass, whose work is cited frequently by the dissent, fully acknowledges: ‘The Court has never said that the right to “deny or explain” sentencing information includes the confrontation rights that Williams rejected: the right to see, hear, and cross-examine the sources of that information.’ [John G. Douglass, Confronting Death: Sixth Amendment Rights at Capital Sentencing, 105 Colum. L.Rev.1967, 1980 (2005).]”
Fields, 483 F.3d at 328-29.
Concerning the interpretation of the former Fifth Circuit Court of Appeals’ decision in Smith, the current Fifth Circuit Court of Appeals did not reach the same *242 conclusion as did the Eleventh Circuit Court of Appeals. The Fifth Circuit Court of Appeals stated:
“Smith v. Estelle, 602 F.2d 694 (5th Cir.1979), neither compels nor implies the rejection of the principles underlying Williams and the extension of the confrontation right to capital sentencing. There, we held that a defendant’s due process rights were violated by the state’s calling a psychiatrist as a surprise witness at a capital sentencing proceeding. Reasoning from Gardner, we stated that ‘[sjurprise can be as effective as secrecy in preventing effective cross-examination, in denying “opportunity for (defense) counsel to challenge the accuracy or materiality of’ evidence.’ Id. at 699 (quoting Gardner). We never hinted, however, that providing a defendant the opportunity to question, with advance preparation, a witness presenting hearsay evidence would not satisfy due process.”
Fields, 483 F.3d at 330. Thus, there is a split of authority between the Fifth Circuit and the Eleventh Circuit regarding the interpretation of the decision of the former Fifth Circuit in Smith.
In Fields, the Fifth Circuit Court of Appeals also found
“wholly unpersuasive the Eleventh Circuit’s extension [in Proffitt ] (in reliance on Gardner and Smith) of the Sixth Amendment confrontation right through the entirety of the capital sentencing process, and we note that that circuit is the only one to have taken that step. The Seventh Circuit has ruled, pursuant to Williams, that the Confrontation Clause does not apply at capital sentencing, [Szabo v. Walls, 313 F.3d 392, 398 (7th Cir.2002),] and the Fourth Circuit has expressed doubt that it does[, United States v. Higgs, 353 F.3d 281, 324 (4th Cir.2003) ].”
Fields, 483 F.3d at 330 (footnotes omitted).
Additionally, the Fifth Circuit Court of Appeals stated that “the Supreme Court’s more general ‘death is different’ jurisprudence does not call into doubt either the relevance or the persuasiveness of Williams on the question presented in the instant case.” Fields, 483 F.3d at 331. The Fifth Circuit held that “[a]n examination of Court precedent regarding the Sixth and Eighth Amendments indicates that ‘at least with regard to the rights listed in the Sixth Amendment, the Court’s rules for capital sentencing are essentially the same as for noncapital sentencing .... When it comes to Sixth Amendment rights at sentencing, it seems, death is not so different after all.’ [John G.] Douglass, Confronting Death[: Sixth Amendment Rights at Capital Sentencing], 105 Colum. L.Rev. [1967] at 1993 [ (2005) ].” Fields, 483 F.3d at 331.
Similarly, in United States v. Littlesun, 444 F.3d 1196 (9th Cir.2006), a noncapital case, when faced with an argument that the principles espoused in Williams have been implicitly overruled by Crawford, the Ninth Circuit Court of Appeals held that
“it is not for us to overrule the Supreme Court’s decision in Williams. Under Agostini v. Felton,[12] we are bound to apply controlling Supreme Court precedent until it is explicitly overruled by that Court. And Crawford does not explicitly overrule Williams. Thus the law on hearsay at sentencing is still what it was before Crawford: hearsay is admissible at sentencing, so long as it is ‘accompanied by some minimal indicia of reliability.’
[[Image here]]
*243 Littlesun, 444 F.3d at 1200 (quoting United States v. Berry, 258 F.3d 971, 976 (9th Cir.2001) (some footnotes omitted)).
Furthermore, we note that in United States v. Brown, 441 F.3d 1330 (11th Cir.2006), the Eleventh Circuit Court of Appeals appeared to recognize that its decision in Proffitt is itself an island- among decisions of the Courts of Appeals, and the Court explicitly left open the question whether Crawford applies at the penalty phase of a capital trial:
“We have held that Crawford does not apply in the context of non-capital sentencing. See United States v. Cantellano, 430 F.3d 1142, 1146 (11th Cir.2005). However, death is different, and we have held, in the state habeas context, that the constitutional right to cross-examine witnesses applies to capital sentencing hearings. Proffitt v. Wainwright, 685 F.2d 1227, 1254-55 (11th Cir.1982) (noting that the right of cross-examination applies at capital sentencing hearings and that the right of cross-examination is ‘implicit’ in the Sixth Amendment right of confrontation); see also Chandler [v. Moore], 240 F.3d [907,] 918 [ (11th Cir.2001) ] (holding that in order to comply with the Sixth Amendment, a state capital sentencing statute must allow the defendant the opportunity to rebut hearsay evidence). Our view is, however, far from universally accepted. See, e.g., United States v. Higgs, 353 F.3d 281, 324 (4th Cir.2003) (noting that ‘[i]t is far from clear that the Confrontation Clause applies to a capital sentencing proceeding’ and citing our decision in Proffitt as being contrary to Fourth Circuit law); Szabo v. Walls, 313 F.3d 392, 398 (7th Cir.2002) (citing Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), for the proposition that the Confrontation Clause does not apply to capital sentencing and noting that the Supreme Court ‘has never questioned the precise holding of Williams). District courts that have considered this question in federal capital cases post-Crawford have done so in the context of a bifurcated penalty phase (three stages all together — a guilt-innocence phase, a death-eligibility phase, and a penalty phase) and have held that the Confrontation Clause and Crawford apply in the ‘eligibility' portion of the penalty phase (where the jury determines whether the defendant is statutorily eligible for the death penalty) but not in the ‘selection’ portion of the penalty phase (where the jury determines whether it will actually impose the death penalty). See United States v. Johnson, 378 F.Supp.2d 1051, 1059-62 (N.D.Iowa 2005) (holding that the Confrontation Clause does not apply to the penalty phase after assuming, without deciding, that it applied at the eligibility phase); United States v. Bodkins, No. 4:04CR70083 (W.D.Va. May 11, 2005) [ (not reported in F.Supp.2d) ]; United States v. Jordan, 357 F.Supp.2d 889, 901-04 (E.D.Va.2005). We do not decide whether Crawford applies at the penalty phase of a federal capital trial precisely because the challenged evidence offered in this case was so clearly non-testimonial. Moreover, we offer no opinion on the propriety of trifurcating a federal capital trial so that the penalty phase would be conducted in two distinct parts.”
Brown, 441 F.3d at 1361 n. 12 (first emphasis added; second emphasis in the original).
*244 Therefore, if Crawford stands for the proposition that confrontation is the only permissible method of assessing reliability anytime the Confrontation Clause applies, Brown appears to state that in the Eleventh Circuit, in spite of Proffitt, the Confrontation Clause may not always apply at capital sentencing because Brown explicitly declined to “decide whether Crawford applies at the penalty phase of a federal capital trial.”
In its brief on appeal in the present case, the State relies on Doster v. State, 72 So.3d 50 (Ala.Crim.App.2010). In Doster, this Court addressed a capital-murder defendant’s claim that during sentencing the trial court violated the defendant’s constitutional rights by considering his prior convictions set out in the presentence report. We stated:
“In Coral v. State, 628 So.2d 988 (Ala.Crim.App.1992), we discussed the admission of , the contents of a presentence report and stated:
“ ‘ “Courts are permitted to consider hearsay testimony at sentencing. ... While hearsay evidence may be considered in sentencing, due process requires both that the defendant be given an opportunity to refute it and that it bear minimal indicia of reliability....” Kuenzel v. State, 577 So.2d 474, 528 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991) (quoting United States v. Giltner, 889 F.2d 1004, 1007 (11th Cir.1989)). See also Smiley v. State, 435 So.2d 202 (Ala.Cr.App.1983).
“ ‘Section 13A-5-45 provides, in pertinent part, the following:
“ ‘ “(c) At the sentence hearing evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to the aggravating and mitigating circumstances referred to in sections 13A-5-49, 13A-5-51 and 13A-5-52....
“‘“(d) ,Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements .... ”
“ ‘These statutory provisions clearly provide for the admissibility of hearsay evidence during the sentencing stage of a capital defendant’s trial, so long as the defendant is given a fair opportunity to rebut it. The record in the instant case shows that the appellant was given ample opportunity to rebut the information contained hi the presentence report and that he did object to portions of the report during the sentencing hearing. Thus, we find that the trial court could properly. have considered the hearsay in the report.’
“628 So.2d at 991-92.
“ ‘It is clear to this court that the [presentence] report is entirely consistent with Alabama’s capital murder statute regarding evidence to be considered in sentencing. Section 13A-5-45(d), Code states, “[a]ny evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements.” Further, the report itself is an out-of-court statement and is entirely hearsay. However, it is admissible under § 13A-5-47 Code of Alabama, being *245 specifically called for consideration by the trial court.’
“Thompson v. State, 503 So.2d 871, 880 (Ala.Crim.App.1986). See Kuenzel v. State, 577 So.2d 474, 527 (Ala.Crim.App.1990) (‘The inclusion of the defendant’s criminal history in the presentence investigative report was proper.’). See also United States v. Ramirez, 271 F.3d 611, 612 (5th Cir.2001) (‘In making factual sentencing determinations, a presen-tence report is considered reliable and may be considered by the trial judge.’); State v. Grimes, 143 Ohio App.3d 86, 90, 757 N.E.2d 413, 416 (2001) (‘In [State v.] Cook, [83 Ohio St.3d 404, 700 N.E.2d 570 (1998),] the Supreme Court held that “reliable hearsay, such as a presentence investigation report, may be relied on by the trial judge.” ’); State v. Burdett, 134 Idaho 271, 275, 1 P.3d 299, 303 (Idaho Ct.App.2000) (‘It is well settled that hearsay information believed to be reliable may be set forth in a presentence report, so long as the defendant is afforded an opportunity to present favorable evidence and to explain or rebut the adverse information.’); State v. Baker, 956 S.W.2d 8, 17 (Tenn.Crim.App.1997) (‘[T]he Tennessee Criminal Sentencing Reform Act of 1989 contemplates that much of the information contained in a presentence report will be hearsay. However, the information is reliable because it is based upon the presentence officer’s research of the records, contact with relevant agencies, and the gathering of information which is required to be included in a presentence report.’). Compare United States v. Bennett, 472 F.3d 825, 833-34 (11th Cir.2006) (‘[The defendant] failed to object to the facts of his prior convictions as contained in his PSI [presentence investigation report] and addendum to the PSI despite several opportunities to do so; thus, he is deemed to have admitted those facts.’); United States v. Mueller, 902 F.2d 336, 346 (5th Cir.1990) (‘As [the defendant] presented no relevant affidavits or evidence in rebuttal, the district court was certainly free to adopt the findings of the PSI [presentence investigation] without more specific inquiry or explanation.’).
“ ‘[Sentencing is different from trial, and the constitutional limitations placed on the latter do not apply to the former. Hearsay may be admitted at sentencing, even in death penalty cases, without violating the Constitution. See Roberts v. United States, 445 U.S. 552 (1980); Williams v. New York, 337 U.S. 241 (1949). To implicate constitutional concerns, the evidence must amount to “misinformation.” See United States v. Tucker, 404 U.S. 443, 446-47 (1972); Town-send v. Burke, 334 U.S. 736, 740-411 (1948). So long as the evidence is reliable and the defendant is provided notice and an opportunity to challenge its reliability, no constitutional violation results from the admission of hearsay at sentencing.’
“Todd v. Schomig, 283 F.3d 842, 853 (7th Cir.2002).
“Here, [the defendant] was given a copy of the presentence report and the opportunity to challenge any inaccurate portions of that report. [The defendant] made no objections to the now challenged presentence report. Nor does [the defendant] argue on appeal that the criminal history as set out in the report was inaccurate or that he was not represented by counsel in the proceedings that resulted in any of his prior convictions detailed in the presentence report. The circuit court complied with the requirements of § 13A-5-47, Ala.Code *246 1975, by correctly considering the uncontested portions of the presentence report.”
Doster, 72 So.3d at 108-10 (emphasis added)..
Petrie recognizes that Doster does not support his position; thus, he contends that “this finding [in Doster ] is in direct conflict with prevailing Eleventh Circuit and Alabama precedent and should be abandoned.” (Petrie’s reply brief, at 61-62.)
Under the plain-error standard of review, Petrie must establish an obvious, indisputable, and egregious error that av-ersely affected the outcome of his sentencing. Although Petrie’s failure to raise his claim in the trial court does not preclude our review in a capital case, it weighs against any claim of prejudice. See Wilson, supra.
We find that Petrie has failed to meet the standard for a finding of plain error. First, Proffitt is distinguishable from the present case. Unlike the defendant in Proffitt, Petrie was not denied the cross-examination of a witness. Under § 13A-5-47(b), Ala.Code 1975, Petrie had the right to respond to the presentence report and to present evidence about any part of the report that was the subject of a factual dispute, and the trial court did not deny Petrie that right. Yet, for whatever reason, Petrie chose not to call the author of the presentence report and cross-examine him. This fact weighs heavily against any allegation that Petrie’s cross-examination of the author of the report would have affected the outcome of his sentencing.
Furthermore, contrary to Petrie’s allegation, it is far from obvious that Crawford and Melendez-Diaz applied to his sentencing. All the post-Crawford decisions of the Courts of Appeals that have decided this issue have stated that Crawford does not apply to capital sentencing. Petrie points to one pre-Crawford case from the Eleventh Circuit Court of Appeals that recognizes a right to cross-examination in the context of capital sentencing, “at least where necessary to ensure the reliability of the witnesses’ testimony.” See Proffitt, supra. However, that case disregards a United States Supreme Court decision that has never been overruled and that explicitly rejects a right to confront and to cross-examine at sentencing. See Williams, supra. Further, -posCCrawford, the Eleventh Circuit has explicitly declined to decide whether Crawford applies at capital sentencing, even after recognizing its prior decision in Proffitt. See Brown, supra.
Also, Petrie has failed to establish that the trial court relied on any specific inaccurate information in making its decision. On appeal, Petrie generally objects to the trial court’s consideration of the presen-tence report, and Petrie points to one specific statement he says was inaccurate. However, the trial court noted his objection to that specific statement, and Petrie has failed to establish that the trial court relied on that statement or on any other inaccurate statement in reaching its decision.
Therefore, for the foregoing reasons, considering that Petrie did not object to the consideration of the presentence report on the ground that the consideration of the report violated Crawford, the trial court did not commit an obvious error by not sua sponte disregarding the statutorily required report based on Crawford. We conclude that the trial court did not commit plain error in receiving and considering the presentence report during sentencing.
XIII.
Next, Petrie argues that the trial *247 court erred in giving an Allen[7] or “dynamite” charge to the jury during the penalty-phase deliberations after the jurors indicated for a third time that they were deadlocked and the jury foreperson stated to the bailiff that “there were jurors back there that seemed to feel pressured about their decision.” (R.2029.) Petrie does not argue that the language in the Allen charge itself was improper. Instead, Pe-trie argues that the trial court erred by giving the Allen charge without making any inquiry concerning the jury foreperson’s statement that there were jurors who seemed to feel pressured about their decision. Petrie contends that under the circumstances, “the trial court’s Allen charge was per se coercive” and that “the coercive nature of the Allen charge lies in the fact that an Allen charge was given at all.” (Petrie’s brief, at 137-88.) Petrie did not raise this claim before the trial court; thus, we will review this claim for plain error only. See Rule 45A, Ala. R.App. P.; Wilson, supra.
On August 12, 2009, the jury began penalty-phase deliberations and deliberated for only 15 minutes before it was excused for the day. The jury resumed deliberations on August 18, 2009, and deliberated for approximately five hours that day. During that five hours of deliberations, the jury twice indicated that it was unable to reach a verdict. On both occasions, the trial court instructed the jury to continue deliberations and to try to reach a verdict. (R.2022-26.) The jury was excused for the day at 4:12 p.m. on August 13 and resumed deliberations at 8:55 a.m. on August 14, 2009. At 10:44 a.m. that day, the jury again indicated that it was unable to reach a verdict. When the jury made this indication, there was a brief exchange between the jury foreperson and the bailiff. At the trial court’s direction, the bailiff explained for the record what had occurred: “Judge, when the foreperson handed me the yellow sheet of paper, he said that there were jurors back there that seemed to feel pressured about their decision. And I stopped him right there.” (R.2029.) The trial court then stated:
“All right. So they have come back— this is the third time they have come back with the note that indicates they are in some way unable to reach a verdict that complies with the guidelines that I have given them. When the second note came back, I had thought about giving them a modified type of Allen charge. And I think, if I remember right, both the attorneys said we’ll just release them and let them come back, which was fine with me.
“Let me tell — and being a third question makes it a little bit different. And them feeling some pressure also affects me in that I don’t want to push them. And I’m not a person to be pushing hard on an Allen charge anyway. I just don’t do that. So let me look at this for just a second. And then I will go through it with the attorneys and see what the attorneys think and then we’ll go from there.”
(R.2029-30.)
A short time later, outside the presence of the jury, the trial court read its proposed Allen charge to the attorneys and asked whether there were any objections. At that time, the following exchange occurred:
“[Defense counsel]: I don’t object to the charge, Judge. But I got to tell you, the fact that they feel like they are being pressured back there really is disturbing to me, because I can’t help now but wonder if they were pressured during the guilt phase. That’s just disturb *248 ing to me. It is. I don’t know what they mean by ‘pressured.’ Of course, you always consider each other’s thoughts. I understand that. But I’ve never had a jury come back and say, ‘We feel pressured.’
“The Court: Right. Well, I don’t know if they mean that they are pressuring each other or if they feel like since they have sent us a note saying that they are deadlocked and we sent them back there, that that’s pressure to them.
“[Defense counsel]: I understand.
“The Court: And some of the words that I use — normally, I would not say. If after further deliberations you all feel certain that a verdict cannot be reached, let me know. Usually I don’t say that. That’s taking a lot of edge off of the normal Allen charge. The reason why I do that is because they said that. I normally wouldn’t say that. But I think I need to be very careful under these circumstances.
“[Defense counsel]: Again, we don’t have any problem with the charge, Your Honor.”
(R.2033-34.)
The trial court then gave the following Allen charge to the jury:
“I’m sorry to hear that you have been unable to reach a verdict in this case. I know, as I said yesterday, that you have made extensive efforts and worked very hard to reach a verdict in the case.
“What I do want to do is point out a couple of things to you, some things that I haven’t specifically said — I may have touched upon them briefly — and to tell you how I think that we should proceed.
“As you know, each juror is entitled to his or her opinion of the evidence. But, as you may not know, if you cannot agree on a verdict, then a mistrial as to this phase of the trial would have to be declared and then this phase of the trial would have to be retried. But since the jury can consider the evidence presented during the guilt phase of the trial, then a majority of that evidence would also have to be presented again to another jury.
“So what I would like for you to do is to continue to try to reach a verdict based, upon the parameters that I have given you. Now, T want to tell you a couple other things just to think about— all right — when you go back there.
“This certainly does not mean that you should surrender an honest opinion that you may have as to the weight or the effect of the evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision. But you should give respectful consideration to each other’s views and talk about any differences of opinion in a spirit of fairness and frankness. If possible, you should resolve any differences that you have so that the case may be completed. But I really believe you’ve done this. And I would like for you to consider these instructions further.
“Certainly, it is natural for differences of opinions to arise because reasonable people can differ on things. And I understand that. And when they do, each juror should not only express his or her opinion about the facts and reasons for which he or she bases that opinion. By reasoning the matter out — and we’ve touched on this yesterday — it may be possible to reach a decision within the parameters that I have given you.
“Certainly, what I have said to you must not be taken as an attempt on the part of the Court to require or to force you to surrender your honest and reasonable opinions founded upon the law and the evidence in the case. I do not *249 want you to do that. That’s important for you to know. The sole purpose for me to talk to you right now is to impress upon you your duty and importance of attempting to reach a verdict, if you can conscientiously do so.
“So what I’m going to do is, I’m going to ask you to go back there, talk about it some more with each other. And if after further deliberations you all feel certain that a verdict cannot be reached, then let me know. And at that time, you do not need to tell me what the tally is or anything of that nature. Let me know and I’ll consider that. All right. Thank you very much for your hard work.”
(R.2035-37.)
After the trial court charged the jury, the State and the defense stated that they did not have any objections. The jury resumed deliberations at 11 a.m., and at 12:29 p.m., the jury reached a verdict recommending that Petrie be sentenced to death.
On appeal, Petrie argues that the trial court erred by giving the Allen charge without making any inquiry concerning the jury foreperson’s statement that there were jurors who seemed to feel pressured about their decision. Petrie contends that under the circumstances, the trial court’s Allen charge was coercive because, he says, the charge, “if anything, exacerbated the pressure that those jurors already felt.” (Petrie’s brief, at 139.)
In M.H. v. State, 6 So.3d 41 (Ala.Crim.App.2008), this Court stated:
“In Maxwell v. State, 828 So.2d 347 (Ala.Crim.App.2000), this Court discussed the issue of an Allen charge:
““““The general rule in Alabama has been that it is not improper for the trial court to urge upon the jury the duty of attempting to reach an agreement or verdict as long as the judge does not suggest which way the verdict should be returned.” ’ King v. State, 574 So.2d 921, 927-28 (Ala.Cr.App.1990), quoting McMorris v. State, 394 So.2d 392 (Ala.Cr.App.1980), cert. denied, 394 So.2d 404 (Ala.1981),. cert. denied, 452 U.S. 972, 101 S.Ct. 3127, 69 L.Ed.2d 983 (1981). An Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), charge, also known as a ‘dynamite charge,’ is permissible if the language of the charge is not coercive or threatening. Grayson v. State, 611 So.2d 422, 425 (Ala.Cr.App.1992); King v. State, 574 So.2d at 928.”
“ ‘Gwarjanski v. State, 700 So.2d 357, 360 (Ala.Cr.App.1997). Further, “[w]hether an ‘Allen charge’ is coercive must be evaluated in the ‘whole context’ of the case.” Miller v. State, 645 So.2d 363, 366 (Ala.Cr.App.1994).’
“828 So.2d at 365. “‘The Supreme Court and this court have held on numerous occasions that the ‘Allen ’ or ‘dynamite charge’ is. not error unless the language used is threatening or coercive.” ’ Miller v. State, 645 So.2d 363, 366 (Ala.Crim.App.1994), quoting Grayson v. State, 611 So.2d 422, 425 (Ala.Crim.App.1992).”
M.H., 6 So.3d at 47-48.
In the present case, we have reviewed the trial court’s Allen charge in the context of the entire case, and we conclude that neither the giving of the charge nor the language in the charge itself was coercive. It was not per se improper for the trial court to urge upon the jury the duty of attempting to reach a verdict. The trial court’s charge very straightforwardly informed the jury that each juror was in no way required to surrender his or her opinion. We are aware that, as Petrie points *250 out in his brief, the fact that a jury returned a verdict shortly after receiving a charge can suggest the possibility of coercion. See Lowenfield v. Phelps, 484 U.S. 231, 240, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (stating that the fact that the jury in a capital-murder case returned with its verdict soon after receiving a supplemental instruction can suggest the possibility of coercion, but holding that the importance of that fact was lessened because the defense counsel did not object, which indicates that the potential for coercion “was not apparent to one on the spot”). However, in the present case, the jury returned the verdict an hour and a half after the charge, the defense did not object, there was nothing coercive in the language of the charge itself, and the charge did not mention a deadline for the jury to reach a verdict. Thus, we find little, if any, suggestion of coercion based on the amount of time that elapsed between the trial court’s giving the charge and the jury’s returning its verdict. See McGilberry v. State, 516 So.2d 907, 910 (Ala.Crim.App.1987) (although jury, which had been deliberating for less than three hours, returned verdict five minutes after trial court’s Allen charge, the court’s giving of the Allen charge was not erroneous because the court’s charge was not coercive and the court did not set a deadline for the jury to return with a verdict). Furthermore, we disagree with Petrie’s suggestion that the Allen charge was coercive because the trial court failed to make any inquiry concerning the jury foreperson’s statement that there were jurors who seemed to feel pressured about their decision. Petrie fails to cite, and we are unaware of, any authority that would require the trial court to make such an inquiry. Therefore, based on the entire circumstances surrounding the giving of the Allen charge, we find no error, much less plain error, in the trial court’s giving the charge.
XIV.
Next, Petrie argues that his death sentence is unconstitutionally disproportionate under the Eighth Amendment to the United States Constitution because, he says, some other similarly situated defendants were not sentenced to death. Specifically, Petrie argues that the proportionality determination this Court is required to make under § 13A-5-53(b)(8), Ala.Code 1975, “must take into account similar cases in which the sentence was fixed at less than death.” (Petrie’s brief, at 142.) Pe-trie cites only cases from other jurisdictions to support his argument. (Petrie’s brief, at 142-43.)
Section 13A-5-53(b)(3), Ala.Code 1975, provides:
“(b) In determining whether death was the proper sentence in the case the Alabama Court of Criminal Appeals, subject to review by the Alabama Supreme Court, shall determine:
[[Image here]]
“(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.”
Although statutorily required, “ ‘a comparative proportionality review is not constitutionally required.’ ” Minor v. State, 914 So.2d 372, 443 (Ala.Crim.App.2004) (quoting Davis v. State, 718 So.2d 1148, 1163 (Ala.Crim.App.1995)). Furthermore, “even under § 13A-5-53(b), this Court does not look to other jurisdictions to determine whether a death sentence is excessive or disproportionate.” Minor, 914 So.2d at 443-44. Additionally, “the United States Supreme Court has specifically rejected the claim that a capital defendant can prove an Eighth Amendment violation ‘by demonstrating that other defendants who may be similarly situated did *251 not receive the death penalty.’ ” Ex parte Barbour, 673 So.2d 473 (Ala.1995) (quoting McCleskey v. Kemp, 481 U.S. 279, 306-307, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)). Therefore, we find that Petrie’s argument is without merit.
Further, pursuant to § 13A-5-53(b)(3), Ala.Code 1975, considering both the crime and the defendant, we determine that Pe-trie’s sentence was not excessive or disproportionate to the penalty imposed in similar cases. Similarly situated defendants have received the death penalty throughout this State. See, e.g., Hammonds v. State, 777 So.2d 750 (Ala.Crim.App.1999) (rape/murder); Freeman v. State, 555 So.2d 196 (Ala.Crim.App.1988) (rape/murder).
XV.
Next, Petrie argues that Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), invalidates critical aspects of Alabama’s capital-sentencing scheme and renders his sentence unconstitutional. In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the United States Supreme Court held that any fact that increases the penalty for a crime above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt. In Ring, the Court extended its holding in Apprendi to death-penalty cases.
Petrie argues that determining whether the aggravating circumstances outweigh the mitigating circumstances is a factual determination. Consequently, Petrie argues that Ring invalidates Alabama’s capital-sentencing scheme because, he says, Ring requires that the jury, not the trial court, determine whether the aggravating circumstances outweigh the mitigating circumstances. See (Petrie’s brief, at 145); see also §§ 13A-5-46(e), 13A-5-47(e), and 13A-5-48, Ala.Code 1975. Petrie further argues that Ring invalidates Alabama’s capital-sentencing scheme because, under that scheme, after the jury finds the existence of at least one statutory aggravating circumstance, the trial court is allowed to find the existence of additional aggravating circumstances; thus, Alabama’s capital-sentencing scheme does not require that the jury make every factual determination. (Petrie’s brief, at 145-48.)
As Petrie appears to recognize, the arguments he raises were rejected by the Alabama Supreme Court in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002). In Waldrop, concerning whether Ring requires that the jury, not the trial court, determine whether the aggravating circumstances outweigh the mitigating circumstances, the Supreme Court explained:
“[T]he weighing process is not a factual determination. In fact, the relative ‘weight’ of aggravating circumstances and mitigating circumstances is not susceptible to any quantum of proof. As the United States Court of Appeals for the Eleventh Circuit noted, “While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard ... the relative weight is not.’ Ford v. Strickland, 696 F.2d 804, 818 (11th Cir.1983). This is because weighing the aggravating circumstances and the mitigating circumstances is a process in which ‘the sen-tencer determines whether a defendant eligible for the death penalty should in fact receive that sentence.’ Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). Moreover, the Supreme Court has held that the sentencer in a capital case need not even be instructed as to how to weigh particular facts when making a sentencing decision. See Harris v. Alabama, 513 U.S. 504, 512, 115 S.Ct. 1031, 130 *252 L.Ed.2d 1004 (1995) (rejecting ‘the notion that “a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required” ’ (quoting Franklin v. Lynaugh, 487 U.S. 164, 179, 108 S.Ct. 2820, 101 L.Ed.2d 155 (1988)) and holding that ‘the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer’). ■
“Thus, the weighing process is not a factual determination or an element of an offense; instead, it is a moral or legal judgment that takes into account a theoretically limitless set of facts and that cannot be reduced to a scientific formula or the discovery of a discrete, observable datum.
In Ford v. Strickland, supra, the defendant claimed that ‘the crime of capital murder in Florida includes the element of mitigating circumstances not outweighing aggravating circumstances and that the capital sentencing proceeding in Florida involves new findings of fact significantly affecting punishment.’ Ford, 696 F.2d at 817. The United States Court of Appeals for the Eleventh Circuit rejected this argument, holding that ‘aggravating and mitigating circumstances are not facts or elements of the crime. Rather, they channel and restrict the sentencer’s discretion in a structured way after guilt has been fixed.’ 696 F.2d at 818. Furthermore, in addressing the defendant’s claim that the State must prove beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances, the court stated that the defendant’s argument
“ ‘seriously confuses proof of facts and the weighing of facts in sentencing. While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard, see State v. Dixon, 283 So.2d 1, 9 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. [1950], 40 L.Ed.2d 295 (1974), and State v. Johnson, 298 N.C. 47, 257 S.E.2d 597, 617-18 (1979), the relative weight is not. The process of weighing circumstances is a matter for judge and jury, and, unlike facts, is not susceptible to proof by either party.’
“696 F.2d at 818. Alabama courts have adopted the Eleventh Circuit’s rationale. See Lawhorn v. State, 581 So.2d 1159, 1171 (Ala.Crim.App.1990) (‘while the existence of an aggravating or mitigating circumstance is a fact susceptible to proof, the relative weight of each is not; the process of weighing, unlike facts, is not susceptible to proof by either party'); see also Melson v. State, 775 So.2d 857, 900-901 (Ala.Crim.App.1999); Morrison v. State, 500 So.2d 36, 45 (Ala.Crim.App.1985).
“Thus, the determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently, Ring and Apprendi do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.”
Waldrop, 859 So.2d at 1189-90.
Further, concerning whether Ring permits the trial court to find the existence of aggravating circumstances in addition to those found by the jury to exist, the Supreme Court explained:
“Waldrop claims that the trial court’s determination that the murders were especially heinous, atrocious, or cruel as compared to other capital offenses — an aggravating circumstance under Ala. Code 1975, § 13A-5-49(8) — is a factual *253 determination that under Ring must be made by the jury. However, Ring and Apprendi do not require that the jury make every factual determination; instead, those cases require the jury to find beyond a reasonable doubt only those facts that result in ‘an increase in a defendant’s authorized punishment ... ’ or ‘ “expose[ ] [a defendant] to a greater punishment....’” Ring, 536 U.S. at 602, 604, 122 S.Ct. at 2439, 2440 (quoting Apprendi, 530 U.S. at 494, 120 S.Ct. 2348). Alabama law requires the existence of only one aggravating circumstance in order for a defendant to be sentenced to death. Ala.Code 1975, § 13A-5-45(f). The jury in this case found the existence of that one aggravating circumstance: that the murders were committed while Waldrop was engaged in the commission of a robbery. At that point, Waldrop became ‘exposed’ to, or eligible for, the death penalty. The trial court’s subsequent determination that the murders were especially heinous, atrocious, or cruel is a factor that has application only in weighing the mitigating circumstances and the aggravating circumstances, a process that we held earlier is not an ‘element’ of the offense.”
Waldrop, 859 So.2d at 1190.
Petrie contends that Waldrop was wrongly decided. However, “[t]his Court has no authority to overrule Alabama Supreme Court precedent.” Whatley v. State, 146 So.3d 437, 488 (Ala.Crim.App.2011) (opinion on return to remand) (citing § 12-3-16, Ala.Code 1975).
Therefore, based on the Alabama Supreme Court’s decision in Waldrop, we find no merit in Petrie’s contention that Ring invalidates critical aspects of Alabama’s capital-sentencing scheme. Furthermore, because Petrie was convicted of murdering Lim during a rape in the first degree, the jury’s verdict at the guilt phase established the existence of one aggravating circumstance, § 13A-5-49(4), Ala.Code 1975, thereby making Petrie eligible for the death penalty. Under Wal-drop, Petrie’s sentence does not violate Ring; thus, contrary to Petrie’s contention, his sentence is not unconstitutional.
XVI.
Petrie’s final claim is that the cumulative effect of the above alleged errors affected his substantial rights and warrants a new trial.
“ ‘The Alabama Supreme Court has set forth the cumulative-error rule as follows: “[W]hile, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors have ‘probably injuriously affected substantial rights of the parties,’ then the cumulative effect of the errors may require reversal.” Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (quoting Rule 45, Ala. R.App. P.). Applying this standard to Lewis’s allegation of cumulative error, we have scrupulously reviewed the record and find no evidence that the cumulative effect of any of the individually nonreversible errors in this case affected Lewis’s substantial rights at trial.’
“Lewis v. State, [24 So.3d 480, 538 (Ala.Crim.App.2006) ].”
Sharifi v. State, 993 So.2d 907, 946-47 (Ala.Crim.App.2008). We find that the cumulative effect of any individually nonrev-ersible errors did not affect Petrie’s substantial rights. Therefore, this claim is without merit.
*254 XVII.
As required by § 13A-5-53, Ala. Code 1975, we must address the propriety of Petrie’s death sentence. Petrie was indicted for, and convicted of, murdering Lim during a rape in the first degree, an offense defined as capital by § 13A-5-40(a)(3), Ala.Code 1975. The jury, by a vote of 10 to 2,- recommended that Petrie be sentenced to death. The trial court followed the jury’s recommendation and sentenced Petrie to death.
The record reflects that Petrie’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala. Code 1975.
The trial court found as aggravating circumstances that Petrie committed the murder while under sentence of imprisonment, an aggravating circumstance as defined in § 13A-5-49(1), Ala.Code 1975; that Petrie had previously been convicted of a felony involving the use or threat of violence to the person, an aggravating circumstance as defined in § 13A-5-49(2), Ala.Code 1975; and that the murder was committed during a rape, an aggravating circumstance as defined in § 13A-5-49(4), Ala.Code 1975. The trial court found no statutory mitigating circumstances. The trial court found as nonstatutory mitigating circumstances that Petrie suffered a chaotic and unstable childhood, which included a father who drank in excess, parents who divorced, and moves from Illinois to Mississippi to Florida with different family members; that Petrie had a father who hit Petrie’s mother and who set a poor example for Petrie and a stepfather who hit Petrie’s brother on at least one occasion; that Petrie tried to better himself and assist others while serving his 26-year sentence for armed robbery; and that there was no indication of poor behavior by Petrie while in prison or in the county jail pending disposition of the present case. The trial court found that the aggravating circumstances outweighed the mitigating circumstances and that a death sentence was warranted.
We have independently weighed the aggravating and the mitigating circumstances as required by § 13A-5-53(b)(2), Ala.Code 1975, and are convinced, as was the trial court, that death was the 'appropriate sentence for the murder that Petrie committed.
As noted earlier in issue XIV, pursuant to § 13A-5-53(b)(3), Ala.Code 1975, we determine that Petrie’s sentence is neither disproportionate nor excessive to the penalty imposed in similar cases. See, e.g., Hammonds v. State, 777 So.2d 750 (Ala.Crim.App.1999) (rape/murder); Freeman v. State, 555 So.2d 196 (Ala.Crim.App.1988) (rape/murder).
Lastly, as required by Rule 45A, Ala. R.App. P., we have searched the record for any error that has or probably has adversely affected Petrie’s substantial rights and have found no plain error or defect in the proceedings under review.
For the foregoing reasons, Petrie’s conviction for murder made capital because it was committed during a rape and his sentence of death are affirmed.
AFFIRMED.
WELCH, KELLUM, and JOINER, JJ., concur.
WINDOM, P.J., recuses herself.

. The national CODIS is a searchable DNA profile database that is maintained by the Federal Bureau of Investigation.

. On appeal, Petrie does not argue that the evidence concerning his collateral bad acts against O’Rourke was improperly admitted.

“ [1]This approach is consistent with the plain language of Rule 404(b) and with the holdings of other courts. See United States v. Barnes, 49 F.3d 1144, 1148 (6th Cir.1995) (holding that once a defendant makes a request for notice of *202 ‘other-crimes’ evidence that the prosecution intends to use at trial, ‘the request imposes a continuing obligation on the government to comply with the notice requirement of Rule 404(b) whenever it discovers information that meets the previous request’); United States v. Spinner, 152 F.3d 950, 961 (D.C.Cir.1998) (holding that the prosecution should have given notice of its intent to introduce bad-acts evidence pursuant to Rule 404(b) after ‘something [arose] in the defense case that was unexpected’).”

. The Sixth Amendment to the United States Constitution provides, in part: "In all crimi *236 nal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” The Sixth Amendment’s Confrontation Clause has been found applicable to the States through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

. We note that shortly after Proffitt was decided, in Ex parte Clisby, 456 So.2d 95 (Ala.1983), the Alabama Supreme Court recognized Proffitt and remanded a case to this Court with instructions to remand it for the trial court to consider whether, in light of Proffitt and Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the capital-murder defendant’s rights of cross-examination were violated by the trial court’s consideration in sentencing of two letters concerning a psychiatrist's conclusion about the defendant's mental condition. However, our Supreme Court did not hold that the defendant’s rights of cross-examination had been violated, and there was very little discussion in Clisby about the implications of Prof-fitt.

. Williams analyzed the defendant’s argument based on due-process grounds because the Sixth Amendment's Confrontation Clause had not yet been incorporated and made applicable to the States. See Pointer v. Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

. In 1981, the former Fifth Circuit Court of Appeals was split into the Fifth and Eleventh Circuit Courts of Appeals. "Decisions of the Fifth Circuit prior to the Eleventh Circuit’s split from the Fifth Circuit are binding on the Eleventh Circuit. Bonner v. City of Prichard, Alabama, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).” United States v. Dean, 604 F.3d 1275, 1279 n. 1 (11th Cir.2010).

“ [12]Agostini v. Felton, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (Tf a precedent of this Court has *243 direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.’ (internal citation omitted)).”

. Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).